The AMERICAN SHIP BUILDING COMPANY, Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR; Samuel C. Logan, Respondents.

No. 87-3730.

United States Court of Appeals, Sixth Circuit.

Argued May 6, 1988.

Decided Jan. 10, 1989.

Anthony B. Giardini (argued), Bradley & Giardini Co., LPA, Lorain, Ohio, for petitioner.

Janet R. Dunlop (argued), Office of the Solicitor, U.S. Dept. of Labor, for respondents.

Ben Sheerer Lorain, Ohio, for Samuel Logan.

Before MERRITT and NORRIS, Circuit Judges, and HACKETT, District Judge.[*]

ALAN E. NORRIS, Circuit Judge.

Petitioner, The American Ship Building Company ("AmShip"), seeks review of a Benefits Review Board ("Board") order reversing an administrative law judge's order that the special fund,[1] created by the Longshore and Harbor Workers' Compensation Act, ch. 509, 44 Stat. 1424 (codified as amended in 33 U.S.C. §§ 901–945, 947–950) (1927) ("LHWCA"), reimburse AmShip for "second injury" benefits paid to its employee, Samuel C. Logan. The "special fund" provision is an exception to the LHWCA's general rule of workers' compensation law, that an employer takes an employee as he finds him. Under the exception, when an employee having an existing permanent partial disability is injured, with the result that the injury and preexisting condition in combination result in a materially and substantially greater permanent partial disability or in permanent total disability, payment of workers' compensation benefits is apportioned between the employer and the special fund, with the employer responsible, at most, for 104 weeks of compensation.

## I

## BACKGROUND

Logan had worked for eighteen years for AmShip. On June 2, 1980, his left leg slipped through a grating he was installing in the engine room aboard a ship. His injury required surgery and hospitalization. In September of 1980, Dr. Delbert L. Fischer, an orthopedist, began to treat Logan for lower back pain. Dr. Fischer diagnosed spondylolisthesis and scoliosis of the lumbar vertebrae. Logan has not been able to return to his former job or to any available suitable employment since his accident.

In March of 1980, prior to the accident, Logan had received medical treatment for hemorrhoids. As a part of that treatment, a barium enema X-ray was taken which showed the spondylolisthesis and scoliosis, but was not read at that time for those conditions. Neither condition had been diagnosed medically prior to the date of the injury.

Dr. Fischer reported his findings to AmShip on September 18, 1980. From X-rays taken during Logan's hospitalization, he concluded that there was "no question about spondylolisthesis" and scoliosis, and also noted that the earlier barium enema X-ray "fortuitously" showed the same conditions. In addition, he reported that visual examination of Logan disclosed that his right leg measured one inch shorter than his left leg. The report stated, "he is noted to list to his right and he stands with his pelvis tilted to the right."

Logan had been told, when he entered military service, that he had a shorter leg and curvature of the spine. However, he testified that he had never had back problems prior to the accident.

The A.L.J. concluded that (1) Logan had been totally and permanently disabled since June 2, 1980; (2) the injury on that date was superimposed upon Logan's preexisting spondylolisthesis and degenerative joint disease and had caused a disability which was materially and substantially greater

---

[*] The Honorable Barbara K. Hackett, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1] The special fund, also known as the second injury fund, is established under 33 U.S.C. § 944, for the payment of certain compensation benefits whose burden Congress has decreed should be borne by the entire industry rather than by a single employer. See 20 C.F.R. §§ 702.142–.148, .321 (1987); Smith, *The Special Fund under the Longshore and Harbor Workers' Compensation Act,* 11 Mar.Law. 71, 73–74 (1986).

than that which would have resulted from the job-related injury alone; and (3) Logan suffered from a preexisting permanent partial disability which was manifest to Am-Ship while he was still working for it. Accordingly, the A.L.J. held the special fund was liable for all benefits in excess of those for 104 weeks.

On appeal by the Director of the Office of Workers' Compensation Programs, the Board reversed the A.L.J.'s order upon the ground that the mere existence of the 1980 barium enema X-ray, without any relevant diagnoses or interpretations prior to the date of the subsequent injury, was not sufficient to satisfy the "manifest requirement" of 33 U.S.C. § 908(f).

Under the regulations of the Board, 20 C.F.R. § 702.321(a)(1),[2] and case law from the District of Columbia Circuit, and the First, Third, Fourth, Fifth, Eighth, Ninth, and Eleventh Circuits,[3] in order to obtain relief from the special fund under § 908(f), the employer must show that (1) the claimant had an existing permanent partial disability prior to the last injury; (2) the disability was manifest to the employer; and (3) the current disability is not due solely to the most recent injury.

AmShip first argues that a manifest condition requirement is not warranted by the language of § 908(f), and urges us not to follow the authorities from the other circuits. In the alternative, it argues that Logan's prior disability was manifest, both

because his spinal condition was clearly shown on the barium enema X-ray and because his "list and tilt"[4] were apparent to the naked eye.

The Director argues that we should join the other circuits because the manifest condition rule is inherent in the statutory requirement that the employee must have sustained an "existing permanent partial disability"; the rule is consistent with the intent of Congress in enacting LHWCA; and the amendments to LHWCA in 1972 indicate congressional approval of judicial interpretations by the other circuits.

We are thus confronted with an issue of first impression—whether the language of § 908(f) should be read to mean that a worker has an existing permanent partial disability only if the employer, prior to employing the worker or prior to the time of his second injury, has knowledge of the preexisting condition or information about it that would motivate a cautious employer either to refuse to hire the worker or to discharge him because of a greatly increased risk of employment-related accident and compensation liability.[5]

## II

### STANDARD OF REVIEW

We have jurisdiction to review final orders of the Benefits Review Board under 33 U.S.C. § 921(c). In determining that a

---

**2.** The regulation establishes the procedures to be followed where an employer or insurance company files an application for limitation of liability under Section 8(f). One of the requirements is that the application must set forth "the basis for the assertion that the pre-existing condition relied upon was manifest in the employer." 20 C.F.R. § 702.321(a)(1)(iii).

**3.** *See American Mutual Ins. Co. of Boston v. Jones,* 426 F.2d 1263, 1266–67 (D.C.Cir.1970); *White v. Bath Iron Works Corp.,* 812 F.2d 33, 35 (1st Cir.1987); *Atlantic & Gulf Stevedores, Inc. v. Director, Office of Workers' Comp. Prog.,* 542 F.2d 602, 606 (3d Cir.1976); *Lambert's Point Docks, Inc. v. Harris,* 718 F.2d 644, 648 (4th Cir.1983); *Equitable Equip. Co. v. Hardy,* 558 F.2d 1192, 1196–97 (5th Cir.1977); *Duluth, M. and I.R. Ry. Co. v. United States Dept. of Labor,* 553 F.2d 1144, 1150–51 (8th Cir.1977); *Dillingham Corp. v. Massey,* 505 F.2d 1126, 1128 (9th

Cir.1974); *Jacksonville Shipyards v. Director, Office of Workers' Comp. Prog.,* 851 F.2d 1314 (11th Cir.1988). These opinions are, of course, entitled to respect, but are not binding upon us. *Louisville & N. R.R. v. United States (In re Tennessee Cent. Ry.),* 498 F.2d 904, 905 (6th Cir. 1974).

**4.** AmShip relies on Dr. Fischer's post-injury medical reports. No evidence in the record shows that any representative of AmShip was aware of Logan's condition. It may or may not have been obvious. The Director states that AmShip, if it is able to establish that a mistake of fact has been made, may seek reconsideration under 33 U.S.C. § 922.

**5.** The history of, and reasons for, the requirement are well-stated in *C & P Telephone Co. v. Director, Office of Workers' Comp. Prog.,* 564 F.2d 503, 510–13 (D.C.Cir.1977).

preexisting disability must be manifest to an employer and that an unread X-ray is not manifest to an employer, the Board determined questions of law. Courts of Appeals retain plenary authority to review the Board's legal conclusions. *Director, Office of Workers' Comp. Prog. v. Hill,* 831 F.2d 635, 637 (6th Cir.1987) (black lung benefits); *Brown Badgett, Inc. v. Jennings,* 842 F.2d 899, 901 (6th Cir.1988) (black lung benefits); *see also Atlantic & Gulf Stevedores v. Director, Office of Workers' Comp. Prog.,* 542 F.2d 602, 608 (3d Cir.1976) (disability benefits under LHWCA). Since the Board does not engage in policy-making functions, its interpretation of LHWCA is not entitled to special deference. *Director v. Hill,* 831 F.2d at 637. The interpretation of the Director is entitled to no greater deference than that of the Benefits Review Board. *Director, Office of Workers' Comp. Prog. v. Detroit Harbor Terminals, Inc.,* 850 F.2d 283, 287 (6th Cir.1988).

### III

### THE STATUTE

33 U.S.C. §§ 908(f)(1) and (2)(A) read, in pertinent part:

(f) Injury increasing disability:

(1) In any case in which an employee having an existing permanent partial disability suffers injury, the employer shall provide compensation for such disability as is found to be attributable to that injury....

....

In ... cases of total permanent disability ... found not to be due solely to that injury, of an employee having an existing permanent partial disability, the employer shall provide ... compensation payments ... for one hundred and four weeks only....

(2)(A) After cessation of the payments for the period of weeks provided for herein, the employee or his survivor entitled to benefits shall be paid the remainder of the compensation that would be due out of the special fund established in section 944 of this title....[6]

No language in § 908(f) limits the section's application to employees of an employer who either knows of the preexisting permanent partial disability or who possesses knowledge that makes the preexisting disability "manifest." Instead, in order to shift payment to the special fund, an employer must establish that the worker's permanent total disability is not due solely to the present injury and that the employee has a preexisting permanent partial disability. Accordingly, the doctrine that the employee's previous impairment must be known or manifest to the employer is a "judicial gloss" which Congress has not acted to erase. *See, e.g., Director, Office of Workers' Comp. Prog. v. Newport News Shipbuilding and Dry Dock Co.,* 676 F.2d 110, 114 n. 5 (4th Cir.1982); *Director, Office of Workers' Comp. Prog. v. Brandt Airflex Corp.,* 645 F.2d 1053, 1059 & n. 12 (D.C.Cir.1981).

The circumstances most supportive of adopting the manifest condition doctrine are that it has been embraced by so many other circuit courts of appeals, that there has been administrative reliance upon decisions from those circuits, and that Congress has amended LHWCA [in 1972, and also in 1984 after this action arose] without making material changes in the language at issue.

The first statement by the Supreme Court concerning the statute's purpose appears in *Lawson v. Suwannee Fruit & S.S. Co.,* 336 U.S. 198, 206, 69 S.Ct. 503, 507, 93 L.Ed. 611 (1948), where the Court was concerned with 33 U.S.C. § 908(f) as originally enacted in 1927. The statute then, as now, defined "disability" to mean "incapacity because of injury to earn the wages which the employee was receiving at the time of the injury." The Supreme Court recognized that a major purpose of the second injury proviso is prevention of employer discrimination against handicapped work-

---

**6.** The quoted language reflects Section 8(f) as amended by Section 9 of the Longshore and Harbor Workers' Compensation Act Amendments of 1972, Pub.L. 92–576, 86 Stat. 1251, *reprinted in* 1972 U.S.Code Cong. & Admin. News 1452, 1460.

ers.[7] *Id.* at 201, 69 S.Ct. at 504. The Court then determined that a worker's previous disability need not be one resulting from a previous employment connected injury, because of "the incongruity involved in applying the definition mechanically, the unmistakable purpose of the second injury fund, and the interpretation of the State [New York] statute on which the federal act is based." *Id.* at 206, 69 S.Ct. at 507. The issue of the employer's knowledge of the previous disability was not before the Court.

The same general purpose, with a very significant shift in emphasis toward actually encouraging the employment of the handicapped, was expressed by Congress in 1972, when it amended 33 U.S.C. § 908(f) as a part of the Longshore and Harbor Workers' Compensation Act Amendments of 1972, Pub.L. 92–576, 86 Stat. 1251 (codified as amended in 33 U.S.C. §§ 901–950) (1972) ("the 1972 Amendments").[8] *See* H.R.Rep. No. 1441, 92d Cong., 2d Sess. 8, *reprinted in* 1972 U.S.Code Cong. & Admin.News 4698, 4705–06; S.Rep. No. 1125, 92d Congress, 2d Sess. 7 (1972).

## IV

## JUDICIAL DEVELOPMENT OF THE MANIFEST CONDITION DOCTRINE

In 1970, the Court of Appeals for the District of Columbia Circuit adopted the manifest condition requirement in *Ameri-*

*can Mutual Ins. Co. of Boston v. Jones,* 426 F.2d 1263, 1267–68 (D.C.Cir.1970). In that case, a worker who had sustained serious injuries to his hand, maintained that this physical impairment, when combined with limited intelligence, resulted in his permanent total disability. Although the Court of Appeals affirmed an award of permanent total disability, it concluded that "nothing in the record gives any indication that appellee, up to the time of his injuries, showed a sufficient degree of social maladaption [sic] due to limited intelligence that his disability could be fairly classed as 'manifest.'" *Id.* at 1268. Accordingly, payment of benefits was not shifted to the special fund. The court stressed that a manifestation rule was appropriate since the purpose of the shifting statute was to remove discrimination against the handicapped in hiring, and discrimination would necessarily rest upon a handicap manifesting itself so that a prospective employer could know about it. *American Mutual,* 426 F.2d at 1267–68.

Several years later, the Ninth Circuit adopted the requirement that the preexisting condition be manifest at the time of the claimant's initial employment, relying upon *American Mutual. Dillingham Corp. v. Massey,* 505 F.2d 1126, 1128 (9th Cir.1974).[9] The court noted that the key to the issue is the availability to the employer of knowledge of the preexisting condition, not nec-

---

**7.** In making this observation, the Court relied upon committee testimony in support of the enactment of the section. A witness before the House Judiciary Committee stated that the section would protect both employers and employees. It would protect "an employer who has hired ... a one-eyed worker who goes and loses the other eye" from being required "to pay total permanent disability compensation." It would protect "the worker with one eye from being denied employment on account of his being an extra risk." The Court also noted that a Senate witness had stated that second injury provisions "have become a common place ... in State compensation legislation and ought to be included in the act." *Lawson,* 336 U.S. at 202, 69 S.Ct. at 505 (quoting testimony from Hearings on S. 3170 Before the House Comm. on the Judiciary, 69th Cong., 1st Sess. 208 (1926) and from Hearings on S. 3170 Before the Subcomm. of the Senate Comm. on the Judiciary, 69th Cong., 1st Sess. 43 (1926)).

**8.** The same purpose was again stated in 1984 by the House Education and Labor Committee, in its explanation of the Longshore and Harbor Workers' Compensation Act Amendments of 1984 ("1984 Amendments"): "Section 8(f) was intended to encourage employers to hire disabled workers and permits such employers to distribute among all employers subject to LHWCA, much of the cost of compensating such a worker should the worker suffer a subsequent 'injury.'" H.R.Rep. No. 570, 98th Cong. 2d Sess. pt. 1 at 20–21, *reprinted in* 1984 U.S.Code Cong. & Admin.News 2734, 2753–54.

**9.** The Ninth Circuit has subsequently determined that a partial disability may be manifest to an employer prior to the last injury and not just at the time of claimant's initial employment. *Director, Office of Workers' Comp. Prog. v. Cargill, Inc.,* 709 F.2d 616, 619 (9th Cir.1983).

essarily the employer's actual knowledge of it, and that "[w]hat is manifest to a physician is not necessarily manifest to a lay employer." *Id.* at 1128. The court concluded that although the preexisting condition was revealed by X-ray and resulted in military deferment, it was not manifest to the employer. *Id.*

Other circuits soon fell in line. *Atlantic & Gulf Stevedores, Inc.,* 542 F.2d at 606 (3d Cir.1976); *Duluth, M. and I.R. Ry. Co. v. United States Dept. of Labor,* 553 F.2d 1144, 1148–51 (8th Cir.1977); *Equitable Equip. Co. v. Hardy,* 558 F.2d 1192, 1196–97 (5th Cir.1977); *General Dynamics Corp. v. Sacchetti,* 681 F.2d 37, 39–40 (1st Cir.1982); *Newport News Shipbuilding and Dry Dock Co.,* 676 F.2d at 114 (4th Cir.1982); *Jacksonville Shipyards, Inc. v. Director, Office of Workers' Comp. Prog.,* 851 F.2d 1314, 1316 (11th Cir.1988).

Those decisions are predicated upon the assumption that a windfall would result from allowing an employer, who has no information about an employee's disability, to shift payment of benefits to the special fund, since discrimination can only occur where a prospective employer is aware that the applicant is handicapped.

## V

## CONCLUSION

Whether or not that reasoning of those decisions is sound,[10] it appears to have gone largely unnoticed that congressional emphasis has shifted from concern with discrimination against handicapped workers to actively encouraging their employment, as pointed out earlier in this opinion. It seems to us that in this context the manifest condition rule is counterproductive; that a rule which tells a prospective employer that he need not worry about whether an applicant is handicapped is the one that best encourages hiring handicapped workers. By contrast, the manifest condition rule tells a prospective employer that he must search out handicaps since he

will be rewarded if he finds them and punished if he does not (or if the applicant successfully conceals a handicap). Accordingly, we conclude that enforcement of the statute as written—free of an employer knowledge requirement—best accomplishes the stated purpose of Congress in 1972. Certainly the Director has not indicated how assigning to AmShip total responsibility for payment of Logan's benefits will encourage AmShip or any other employer to hire handicapped persons in the future.

We can however find justification, as a safeguard against fraud, for a requirement that when seeking to satisfy the statute's requirement of proving "an existing permanent partial disability," an employer must, by presenting objective evidence that was in existence prior to the second injury, establish that the condition *manifested itself* to someone prior to that injury. This requirement will be satisfied where the employer can show that the preexisting injury or condition had been documented or otherwise shown to exist prior to the second injury. Obviously, if an employer has hired a worker without realizing that he has a glass eye, and an injury results in the permanent total disability of the worker, the employer will experience no difficulty in proving that the condition manifested itself prior to the injury.

Because proof that Logan's condition had manifested itself prior to his injury was uncontroverted, the order of the Benefits Review Board is REVERSED and workers' compensation benefits are to be apportioned between AmShip and the special fund in accordance with applicable provisions of the LHWCA.

---

**10.** One can certainly argue that the inevitable by-product of requiring a prospective employer to inquire into handicaps is the rejection of handicapped applicants for reasons other than exposure to workers' compensation benefits.