USCA1 Opinion

 

 October 28, 1992 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 92-1337 LIBERTY MUTUAL INSURANCE COMPANY, Petitioner, v. COMMERCIAL UNION INSURANCE COMPANY, ET AL., Respondents. _________________________ ON PETITION FOR REVIEW OF A DECISION OF THE BENEFITS REVIEW BOARD _________________________ Before Selya, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Boyle,* District Judge. ______________ _________________________ Stephen Hessert, with whom Patricia A. Lerwick and Norman, _______________ ____________________ _______ Hanson & DeTroy were on brief, for petitioner. _______________ Allan M. Muir, with whom Kevin M. Gillis and Richardson & ______________ _______________ ____________ Troubh were on brief, for respondent Commercial Union Ins. Co. ______ Laura J. Stomski, Attorney, with whom Marshall J. Breger, _________________ ___________________ Solicitor of Labor, Carol A. De Deo, Associate Solicitor, and ________________ Janet R. Dunlop, Counsel for Longshore, were on brief, for ________________ federal respondent. _________________________ _________________________ __________ *Chief Judge, United States District Court for the District of Rhode Island, sitting by designation. SELYA, Circuit Judge. This doubleheader of a case SELYA, Circuit Judge. _____________ presents not one, but two, interrelated questions. Both questions involve the nexus between occupational disease and the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. 901-950 (1988). First, we must decide whether, as between successive insurance carriers, the primary obligation to provide LHWCA benefits is triggered by a worker's disability or by his awareness of the potential for disability. Second, we must decide whether, as between successive insurance carriers, the date of disablement is the date on which a worker's long-latency disease is first diagnosed or the date on which he first experiences a decrease in earning capacity. For the reasons that follow, we conclude that congressional intent and administrative convenience are best realized by a system in which, for LHWCA purposes, liability for the effects of an occupational disease falls upon the last responsible insurer on the date of disability, as determined by the date of decreased earning capacity. I. I. __ Background Background __________ The underlying facts are not seriously disputed. The claimant, Frederick Libby, worked for Bath Iron Works Corporation (BIW) from 1941 until 1985. Throughout, he faced exposure to asbestos. In December of 1980, Libby learned that he had contracted asbestosis. He remained on the job, doing his regular work, until February 13, 1985, when his physician advised him to 2 quit work. He never returned. From then on, he was totally disabled and entitled to LHWCA benefits. In December 1980, Commercial Union Insurance Company (CUI) was on the risk. Soon thereafter, BIW purchased replacement coverage from Liberty Mutual Insurance Company (Liberty). Liberty's policy took effect on March 1, 1981. Libby filed his claim for disability benefits pursuant to 33 U.S.C. 919(a) on April 10, 1985. Liberty was still the carrier of record. An Administrative Law Judge (ALJ) found Libby's claim compensable and, rejecting Liberty's effort to lay the onus of payment at CUI's doorstep, held Liberty responsible for benefits. The Benefits Review Board (Board) affirmed. Liberty now petitions for judicial review.1 See 33 U.S.C. 921(c). We ___ dismiss the petition. II. II. ___ Analysis Analysis ________ A. A. __ When Does Carrier Liability Attach? When Does Carrier Liability Attach? __________________________________ The threshold issue here is whether, in respect to ____________________ 1The principal respondents in this proceeding are CUI and the Director of the Office of Workers' Compensation Programs of the United States Department of Labor (the Director). The Director has a foot in each camp. He supports the Board's ruling that the date of disability, rather than the date of awareness, controls. However, he disagrees with the Board's formulation of how the date of disability should be determined and seeks a modification of the Board's order in that respect. This modification, if granted, would change the ratio decidendi and, _____ _________ in the bargain, shift the onus of payment from Liberty to CUI. BIW is a doubly honorific party (petitioner and respondent). We ignore its nominal presence. 3 occupational diseases, the date of disablement or the date of awareness of potential disablement determines which of two responsible carriers is liable for LHWCA benefits.2 Although the question is new to us, other courts have grappled with offshoots of it. The seminal case is Travelers Ins. Co. v. ___________________ Cardillo, 225 F.2d 137 (2d Cir.), cert. denied, 350 U.S. 913 ________ _____ ______ (1955). With regard to successive employers, Cardillo held that: ________ the employer during the last employment in which the claimant was exposed to injurious stimuli, prior to the date upon which the claimant became aware of the fact that he was suffering from an occupational disease arising naturally out of his employment, should be liable for the full amount of the award. Id. at 145. The court devised a similar test with regard to ___ successive insurance carriers: the carrier who last insured the "liable" employer during claimant's tenure of employment, prior to the date claimant became aware of the fact that he was suffering from ____________________ 2Our reasoning here is limited to cases involving occupational diseases. Although Congress has never defined the term "occupational disease" for LHWCA purposes, we agree with the Second Circuit that "[t]he generally accepted definition of an occupational disease is any disease arising out of exposure to harmful conditions of the employment, when those conditions are present in a peculiar or increased degree by comparison with employment generally." Gencarelle v. General Dynamics Corp., 892 __________ ______________________ F.2d 173, 176 (2d Cir. 1989) (citation and internal quotation marks omitted). Asbestosis and other occupational diseases give rise to special problems in assigning liability under the LHWCA because, in contrast to episodic injuries (i.e., injuries arising ____ from isolated incidents such as a blow or a slip and fall), occupational diseases involve continued exposure to injurious stimuli. As a result, it is often impossible to identify a precise date on which an injury stemming from such a disease might realistically be said to have occurred. See Travelers Ins. ___ ______________ Co. v. Cardillo, 225 F.2d 137, 144 (2d Cir.), cert. denied, 350 ___ ________ _____ ______ U.S. 913 (1955). 4 an occupational disease arising naturally out of his employment, should be held responsible for the discharge of the duties and obligations of the "liable" employer. Id. The parties agree that Cardillo is the beacon by which we ___ ________ must steer. But, they are at loggerheads over the direction that Cardillo's principles portend for the current controversy. ________ Liberty seizes upon the Cardillo court's statement of ________ the "last responsible employer" rule, quoted supra p.4, and _____ argues that the question before us stands decided: because Libby's condition was diagnosed in 1980, he necessarily "became aware" of his occupational disease at that time and, hence, liability should fall upon CUI. We find this argument overly simplistic. Statements in judicial opinions cannot be wrested free of their factual moorings. Cardillo involved a case of ________ hearing loss in which the worker's awareness of the disease and his actual disablement coincided. The Cardillo court's language ________ must, therefore, be read in this context. It cannot be applied blindly to cases in which awareness and diminished earning capacity occur at separate times. Once we apply truth in labelling and treat the question as open, rather than as a matter of stare decisis, it becomes _____ _______ evident that Liberty's reliance on Cardillo as unswerving ________ authority for an all-encompassing awareness test is as shaky as a shack built upon the shifting sands. Imposing liability based upon the date of disability rather than the date of awareness when the two dates do not coincide better serves the doctrinal impetus behind Cardillo. After all, the last responsible ________ 5 employer rule, and its eponymous offspring, the last responsible insurer rule, derive from an acknowledged need to minimize the obstacles confronting efforts at precise apportionment of liability in the LHWCA context. As we explain below, judicial and legislative recognition of this need, together with other pertinent considerations, converge to support a formulation of the last insurer rule that assigns liability based upon the date of disability rather than the date of awareness. 1. Medical and Administrative Obstacles. Deficiencies 1. Medical and Administrative Obstacles. ____________________________________ in medical knowledge create choppy seas for a system in which awareness, as opposed to disability, determines carrier liability. As the Cardillo court explained in connection with ________ its articulation of the rules governing the liability of employers and their insurers: The nature of occupational diseases and the dearth of medical certainty with respect to . . . [their] evolution, make it exceedingly difficult, if not practically impossible, to correlate the progression of the disease with specific points in time or specific industrial experiences. Cardillo, 225 F.2d at 144. This same uncertainty strongly ________ suggests that the time of actual disability, rather than the time of awareness, should govern application of the last insurer rule. If awareness were to be more than a hollow slogan, it would have to signify an affected worker's knowledge that a particular disease would lead to his disablement during his career. To reach this point, a physician would have to make not only a diagnosis but also a fairly exact prediction as to how the 6 disease would progress in an individual case. This is treacherous, highly speculative terrain. In contrast, the question of when a worker becomes disabled, while complicated, depends largely upon a medical diagnosis of an existing condition. No crystal ball is needed inasmuch as no prediction of future events is entailed. Because there is, on average, much less room for legal wrangling over the backward-looking, one-part question of when a worker became disabled than over the forward-looking, two-part question of when, and if, a worker will become disabled, a rule emphasizing the former datum more closely coheres with the principles motivating the last responsible employer rule. Or, looked at from another angle, if uncertainty with respect to the past progression of a disease is enough of a consideration to influence how liability rules should be shaped, as Cardillo ________ suggests, 225 F.2d at 144-45, there is no sound reason why the far greater uncertainty associated with predictions of the future course, progression, and eventual severity of a disease is not entitled to comparable weight. Then, too, the subjective nature of Liberty's proposed "awareness" test presents an array of epistemic difficulties. As the Court has noted in a different context, "[t]here are special costs to 'subjective' inquiries." Harlow v. Fitzgerald, 457 U.S. ______ __________ 800, 816 (1982). Dispute and delay will almost always surround attempts to answer the essentially subjective inquiry into when a worker first became aware that he had contracted a particular 7 disease. In contradistinction, a last insurer rule based upon date of disability readily lends itself to objective means of proof, encounters fewer factual obstacles, and more smoothly implements the LHWCA. Hinging the test on the more easily verifiable and objective issue of disablement will, therefore, result in a marked lessening of administrative difficulties.3 2. Congressional Intent. Another persuasive rationale 2. Congressional Intent. ____________________ for adopting this incarnation of the rule relates to congressional intent. Of course, we are called upon here to elucidate a judge-made rule, not a legislative provision but the rule governing allocation of insurer liability, like all rules of federal common law, was presumably motivated by a concern "to fill in interstitially or otherwise effectuate the statutory patterns enacted in the large by Congress." United ______ States v. Little Lake Misere Land Co., 412 U.S. 580, 593 (1973) ______ ____________________________ (citation and internal quotation marks omitted); see also ___ ____ ____________________ 3Arguing that a date-of-disability rule would be "unwieldy and confusing," Liberty posits the following hypothetical: if Libby had incurred medical expenses in 1980, when his asbestosis was diagnosed, CUI would have paid them. Hence, Libby's disablement in 1985 would have necessitated either a shifting of responsibility for these previously incurred medical expenses from the original to the subsequent insurer or a framework in which one insurer pays medical benefits while another pays disability benefits. See Petitioner's Brief at 10-11. The ___ perceived dilemma strikes us as inconsequential. Moreover, an awareness-oriented system would have offsetting bookkeeping costs; insurance carriers whose policies were canceled would be required nevertheless to keep the books more open and maintain reserves against potential claims from employees of former insureds. In some cases, the waiting period could be many years. Finally, any added paperwork attributable to adoption of a date- of-disability rule cannot compare with the other administrative inconveniences inherent in a system where awareness governs liability. 8 Cardillo, 225 F.2d at 145. Thus, while we are not bound, in the ________ strictest sense, to follow some specifically articulated statement of congressional intent, we look to the more generally expressed will of Congress for guidance in fleshing out Cardillo's judge-made rule. Cf., e.g., United States v. Fisher, ________ ___ ____ ______________ ______ 6 U.S. (2 Cranch) 358, 386 (1805) (Marshall, C.J.) ("Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived."). When enacting the LHWCA, Congress rejected an apportionment provision that would have avoided imposition of total liability on last employers. Hearing before the Committee on the Judiciary of the House of Representatives on H.R. 9498, 69th Congress, 1st Sess., held April 8, 15, 22, 1926 (Hearing on H.R. 9498), Serial 16, 72, 74. The Cardillo court drew from this ________ legislative history the plausible inference "that the failure to amend was based upon a realization of the difficulties and delays which would inhere in the administration of the Act, were such a provision incorporated into it." Cardillo, 225 F.2d at 145. We ________ believe that these aims and objectives are best satisfied by a date-of-disability rule. See supra Part II(A)(1). Moreover, the ___ _____ reported discussion on the proposed amendment indicates that Congress believed the employer at the time "disability begins" should be liable. See, e.g., Hearing on H.R. 9498, at Serial 16, ___ ____ 72, 74. Since "the treatment of carrier liability was intended to be handled in the same manner as employer liability," Cardillo, 225 F.2d at 145, this bit of history argues ________ 9 convincingly that the date of disability should also determine which of the "liable" employer's insurance carriers must bear the onus of payment.4 Further evidence of congressional intent can be gleaned from recent amendments to the LHWCA. Prior to 1984, an employee's awareness of a relationship between "the injury or death," on the one hand, and the employment, on the other hand, triggered the running of the statutory period for filing claim notices under 33 U.S.C. 912(a). Similarly, former section 13 barred a claim unless filed within a year "after the injury or death." 33 U.S.C. 913 (a) (1982) (amended). Declaring that "[t]he term 'injury' . . . has little applicability in the context of a disability or death which is the result of a long- latency occupational disease," H.R. Rep. No. 570, Part I, 98th Cong., 2d Sess. 10, reprinted in 1984 U.S.Code Cong. & Admin. _________ __ News 2734, 2743, a legislative committee offered amendments which Congress enacted in 1984. In the LHWCA's revised version, the filing period begins to run when "the employee or claimant" learns of the tri-cornered relationship among the employment, the disease, and the disability. See 33 U.S.C. 912(a), 913(b)(2). ___ We take this to mean that Congress identified onset of disability ____________________ 4We note that, because the parties do not dispute that BIW is the liable employer (Libby, after all, worked for only one employer throughout the relevant period), the question of whether explicitly to adopt or revise Cardillo's last responsible ________ employer rule is not before us. However, since the rules governing the allocation of employer and insurer liability operate synergistically, their formulations will perforce be closely related. 10 not occurrence of an injury or awareness of an occupational disease as the critical factor in filing LHWCA claims.5 Indeed, the committee report specifically stated that "[t]he first change to the body which results from exposure to a harmful physical agent or a toxic substance often is not disabling . . . it is disability which should trigger the compensation claim." H.R. Rep. No. 570, supra, 1984 U.S.C.C.A.N. at 2743. That _____ language rather plainly implies that the compensation claim itself, including any attendant liability, cannot arise until the disability begins.6 See Argonaut Ins. Co. v. Patterson, 846 ___ __________________ _________ F.2d 715, 720 (11th Cir. 1988). Liberty advances two reasons why the 1984 amendments should not affect our decision here. First, it asserts that the amended provisions serve different functions than the provisions to which the last insurer rule relates, ergo, the reasons underlying their enactment shed no light on our inquiry. The assertion constitutes a classic non sequitur. In all cases where Congress has avoided echolalia, different statutory provisions will serve different functional ends. But, this does not imply that Congress's statements and actions with respect to one ____________________ 5Amendments to the provision governing computation of average weekly wages for claimants suffering from occupational disease effected similar changes. See 33 U.S.C. 910(i). ___ Again, the legislative history buttresses the idea that Congress enacted these changes because it saw "the onset of the disabling condition" as an important factor. H.R. Rep. No. 570, supra, _____ 1984 U.S.C.C.A.N. at 2745. 6We refer here only to claims for compensation not to claims for medical or other ancillary benefits. 11 portion of a statute provide no insight into the proper interpretation of other portions of the same statute. The reverse is often true. See, e.g., United States v. Riverside ___ ____ _____________ _________ Bayview Homes, Inc., 474 U.S. 121, 138 & n.11 (1985); United ____________________ ______ States v. Mitchell, 445 U.S. 535, 542-43 (1980); 2A J. ______ ________ Sutherland, Statutes and Statutory Construction 47.02 (1992). ____________________________________ When, as here, we are confronted with the task of divining which of two seemingly plausible interpretations of a judicially created rule comports more clearly with congressional intent, it would be presumptuous to ignore explicit congressional pronouncements addressing the issue. See, e.g., North Haven Bd. ___ ____ _______________ of Educ. v. Bell, 456 U.S. 512, 535 (1982); Cannon v. Univ. of ________ ____ ______ ________ Chicago, 441 U.S. 677, 687 n.7 (1979). _______ In a second attempt to resist the onslaught of the 1984 amendments, petitioner relies on the Ninth Circuit's decision in Port of Portland v. Director, OWCP, 932 F.2d 836 (9th Cir. 1991). ________________ ______________ This reliance is mislaid. In Port of Portland, the last __________________ responsible employer was attempting to foist liability on a subsequent non-responsible employer (i.e., a business in whose ____ employ the claimant had not been exposed to any injurious stimuli). The last responsible employer argued that, since the claimant became disabled while in the employ of the subsequent non-responsible employer, the latter should be held liable for compensation. The court brushed the argument aside, observing that it contradicted the Cardillo formulation. See id. at 841 ________ ___ ___ ("Cardillo remains good law."). ________ 12 The case at hand is vastly different. Rather than suggesting that the 1984 amendments uprooted rules of LHWCA liability which have been settled since Cardillo, we acknowledge ________ that the amendments have no substantive effect on the question before us. We find them to be useful, however, in divining congressional intent with respect to the proper workings of the statutory scheme in an area of the law that Cardillo left ________ unsettled. On that basis, the pronouncements of Congress in 1984 constitute additional support for our conclusion that legislative intent favors a system identifying disability, and not awareness, as the critical factor in the assignment of carrier liability under the LHWCA.7 3. The Authorities. Our canvass of the case law 3. The Authorities. _______________ discloses that the only other court of appeals that has directly confronted the same question ruled that the date of disability governs insurer liability under the LHWCA. See Argonaut, 846 ___ ________ ____________________ 7We recognize that in certain settings the use of subsequent legislative history may be controversial. Compare, e.g., United _______ ____ ______ States v. Price, 361 U.S. 304, 313 (1960) (denigrating ______ _____ argumentation based on subsequent legislative history) with, ____ e.g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81 ____ __________________________ ___ (1969) (welcoming such argumentation). We believe the value of resort to subsequent legislative history is best decided case by case. See generally Andrus v. Shell Oil Co., 446 U.S. 657, 666 ___ _________ ______ ______________ n. 8 (1979) (admonishing that subsequent legislative history "should not be rejected out of hand as a source that a court may consider"). In this endeavor, context is all-important. Because our task here is to map the contours of a judicially created rule, we look to the 1984 amendments not in an effort to elucidate the otherwise obscure meaning of a specific statutory provision enacted in 1926, but rather, in hopes of obtaining guidance as to which interpretation of that rule fits more comfortably within the overall statutory framework. Common sense tells us that legislative history, whether contemporaneous or subsequent, can be used for such a purpose. 13 F.2d at 719-20. Cases examining closely analogous questions lend great credence to this result. See Port of Portland, 932 F.2d at ___ ________________ 840 (date of disability governs employer liability); Cordero v. _______ Triple A Mach. Shop, 580 F.2d 1331, 1337 (9th Cir. 1978) (same), ____________________ cert. denied, 440 U.S. 911 (1979); see also 4 A. Larson, The Law _____ ______ ___ ____ _______ of Workmen's Compensation, 95.25(a) (1990) (stating that a __________________________ date-of-disability rule is "frequently chosen" in the workers' compensation area). Finally, administrative precedent is in the same vein. See, e.g., Thorud v. Brady Hamilton Stevedore Co., 18 ___ ____ ______ ____________________________ BRBS 232, 235 (1986) (holding that carrier liability attaches as of date that employee's long-latency occupational disease "affected his ability to earn wages"); Carver v. Ingalls ______ _______ Shipbuilding, Inc., 24 BRBS 243, 246-47 (1991) (holding that ___________________ employer liability attaches at date of disablement). In sum, the case law, while it is fairly sparse, favors the result that we reach today. A point made by the Argonaut court concerning the ________ letter of the Cardillo formulation bears reiteration at this ________ juncture. The Eleventh Circuit, observing that Cardillo linked ________ awareness to suffering, concluded that mere awareness of a disease is not, in and of itself, tantamount to suffering from that disease, especially since the term "suffering" carries "very particular connotations which we cannot assume the Second Circuit meant to ignore." Argonaut, 846 F.2d at 719. We agree with this ________ analysis. And, disablement meshes much more smoothly with the concept of suffering than does awareness. 14 4. Other Considerations. We offer three final 4. Other Considerations. _____________________ comments concerning Liberty's lament that the date-of-disability rule is fundamentally unfair. (1) CUI contracted with BIW at a time when Libby seemed in good health. Conversely, Liberty contracted with BIW at a later date, when Libby's disease was a matter of record and BIW actually knew of it. In that sense, this case presents a choice between assigning liability to an insurer which possessed no way of knowing of an employee's as- yet-undiagnosed affliction or assigning liability to an insurer that was chargeable with advance knowledge when it underwrote the risk. As between the two, it can hardly be deemed unfair to assign liability to the latter. Nor is this an aberration; on average, the opportunities for advance knowledge will be at least equal, and often greater, on the part of the date-of-disability insurer. (2) As with the last responsible employer rule itself, the date-of-disability version of the last insurer rule achieves proportionality, if not in particular cases, then in the insurance industry as a whole. See Cordero, 580 F.2d at 1336. ___ _______ It is trite, but true, that every insurer will be the last insurer sometime. (3) For purposes of treating carriers like Liberty fairly, it is less important that we choose any particular formulation of the last insurer rule than that the chosen rule be fixed and known so that its effects may enter into actuarial calculations of premiums to be charged. 5. Summation. Recognizing, as we do, that Cardillo's 5. Summation. _________ ________ animating principles and the spirit of the LHWCA both dictate 15 that disablement is the critical factor in assigning carrier liability, we align ourselves on this issue with the Board, the respondents, and the weight of authority. We hold that, as between two insurers disputing which must pay claims under the LHWCA, the carrier which last insured the liable employer during the period in which the claimant was exposed to the injurious stimuli and prior to the date the claimant became disabled by an occupational disease arising naturally out of his employment and exposure is responsible for discharging the duties and obligations of the liable employer. B. B. __ When Is a Worker "Disabled"? When Is a Worker "Disabled"? ___________________________ This brings us to the second issue. The Director, who agrees that the date of disability rather than the date of awareness must dictate liability as between successive insurers, asseverates that the mere diagnosis of an occupational disease which will inevitably become disabling, e.g., asbestosis, ____ constitutes disability as a matter of law.8 This contention is planted in the soil of our earlier opinion in Bath Iron Works ________________ Corp. v. White, 584 F.2d 569 (1st Cir. 1978). But, fertile _____ _____ though the soil of circuit precedent may be, White cannot sustain _____ this particular genus of argumentation. 1. Standard of Review. The issue presented poses a 1. Standard of Review. __________________ pure question of law. Therefore, our standard of review is ____________________ 8In this case, the asseveration redounds to Liberty's benefit, and Liberty has not disclaimed it. The Director, however, is clearly its principal sponsor. 16 plenary. See, e.g., Stauble v. Warrob, Inc., ___ F.2d ___, ___ ___ ____ _______ ____________ (1st Cir. 1992) [Nos. 92-1102, 1103, slip op. at 5] (adopting de __ novo standard of review for legal questions) (collecting cases). ____ The Director attempts to vary this standard, asserting that we should defer to his judgment and expertise. The circuits are badly fractured in respect to the degree of deference that ought properly to be afforded to the Director's interpretation of the LHWCA. No fewer than four circuits cede deference to the Director's construction of the LHWCA, at least in cases which focus upon perceived ambiguities in the statutory text. See, ___ e.g., Force v. Director, OWCP, 938 F.2d 981, 983 (9th Cir. 1991); ____ _____ ______________ Newport News Shipbuilding & Dry Dock Co. v. Howard, 904 F.2d 206, ________________________________________ ______ 208 (4th Cir. 1990); Peabody Coal Co. v. Blankenship, 773 F.2d _________________ ___________ 173, 175 (7th Cir. 1985); Boudreaux v. American Workover, Inc., _________ ________________________ 680 F.2d 1034, 1046 & n.23 (5th Cir. 1982) (en banc), cert. _____ denied, 459 U.S. 1170 (1983). Two other circuits have ______ consistently refused to defer. See Director, OWCP v. General ___ _______________ _______ Dynamics Corp., 900 F.2d 506, 510 (2d Cir. 1990); Director, OWCP _______________ ______________ v. O'Keefe, 545 F.2d 337, 343 (3d Cir. 1976). The Sixth Circuit, _______ although originally inclined to extend deference, see Saginaw ___ _______ Mining Co. v. Mazzulli, 818 F.2d 1278, 1283 (6th Cir. 1987), has __________ ________ since decided that deference is inappropriate. See American Ship ___ _____________ Bldg. Co. v. Director, OWCP, 865 F.2d 727, 730 (6th Cir. 1989); _________ ______________ Director, OWCP v. Detroit Harbor Terminals, Inc., 850 F.2d 283, ______________ _______________________________ 287-88 (6th Cir. 1988). Our court has not addressed the subject. We need not enter this thicket today. In the instant 17 case, the relevant uncertainty is as to the workings of a judge- made rule. The Director insists that, "under the law of this _______________________ Circuit, the date of disability from an occupational disease is _______ the date of diagnosis." Director's Brief at 20 (emphasis supplied). He concedes that, "should this Court find that its precedent in White does not apply to this case to define _____ disability as of diagnosis then, [sic] the Board's determination that Liberty Mutual was liable . . . should be upheld," for, without White, "the onset date for the claimant's disability _____ would be the date on which the claimant first suffered a loss of wage-earning capacity." Id. at 23. ___ Under these unusual circumstances, we see no basis for deference. The Director's position concerns merely his interpretation of the case law, not his interpretation of the controlling statute. It is nonsense to suggest that a federal court must defer to an administrative agency in determining the meaning and applicability of the court's own precedent. Accordingly, we examine the Director's assertion that, under White, diagnosis constitutes disability for LHWCA purposes _____ without any special deference but with the customary respect afforded all litigants. 2. The Significance of White. The claimant in White 2. The Significance of White. __________________________ _____ worked as a skilled pipecoverer until learning in 1966 that he had contracted asbestosis. He was then transferred to an unskilled position in the employer's machine shop. The machine shop job ordinarily commanded a lower stipend, but the employer 18 continued to remunerate White at his former wage rate. White, _____ 584 F.2d at 572. Notwithstanding the continuation of wages, the Board found that White sustained a diminution in earning capacity because his disease prevented him from continuing his customary employment and required him to accept inferior employment to earn a livelihood. The Board reasoned that, even though White's earnings were intact, his earning capacity was reduced since the disease had robbed him of the ability to obtain a pipecoverer's wages on the open market. On review, we upheld the Board's conclusion that White was entitled to partial disability payments covering the period of his stay in the machine shop. See id. at ___ ___ 576. Our decision in White, then, stands primarily for the _____ proposition that reduction in earning capacity not out-of- pocket loss is the proper test for availability of permanent partial disability payments. See White v. Bath Iron Works Corp., ___ _____ _____________________ 812 F.2d 33, 35 & n.5 (1st Cir. 1987) (applying this proposition in an unrelated case and citing White in support); see also _____ ___ ____ Gardner v. Director, OWCP, 640 F.2d 1385, 1390 (1st Cir. 1981) _______ ______________ (citing White for essentially the same proposition). This test _____ is firmly rooted in the language of the LHWCA, a statute that defines disablement in pertinent part as the "incapacity because of injury to earn the wages which the employee was receiving at the time of the injury in the same or any other employment." 33 U.S.C. 902(10). This much is uncontroversial. In the Director's view, 19 however, White also teaches a second lesson: that, for LHWCA _____ purposes, diminished earning capacity is a necessary concomitant of asbestosis from and after the time the disease is diagnosed. We disagree. To be sure, in the White case, the employee's _____ disease was sufficiently advanced that, arguably, diagnosis and diminished earning capacity coincided. But, it is too much of a stretch to conclude that, because diagnosis and diminished earning capacity may sometimes occur in tandem, the former is indistinguishable from the latter. We do not believe that the White court either held or intimated that disability and _____ diagnosis are one and the same concept. In a last-ditch effort to instill this belief, the Director highlights an excerpt from our opinion in White: _____ The diagnosis . . . of probable asbestosis determined medically that White had an occupational disease. There was a time bomb implanted in his lungs, the power of which to disable and destroy became stronger with increased exposure to asbestos dust. To argue that there must be outward physical symptoms before a finding of permanent partial disability flies in the face of common sense as well as the medical evidence. 584 F.2d at 576. The Director says that this passage equates diagnosis with disability. He is wrong. The White court was _____ merely dispelling an argument that a finding of permanent partial disability always requires proof of overt physical symptomatology. Significantly, the sentence immediately following the quoted passage states: The Board's conclusion that White's disease did, in fact, result in an impairment of earning capacity and thus a compensable 20 disability is supported by substantial medical and factual evidence and has a reasonable legal basis. Id. In other words, White does not instruct that, as a matter of ___ _____ law, asbestosis, once diagnosed, automatically lessens earning capacity.9 White teaches, instead, that on particular occasions _____ the Board may find that diagnosis and reduced earning capacity coincide and that it may do so despite the absence of outward physical symptoms, provided that its decision is supported by other substantial evidence of diminished earning capacity. See, ___ e.g., B.S. Costello, Inc. v. Meagher, 867 F.2d 722, 727 (1st Cir. ____ ___________________ _______ 1989) (citing White as a "substantial evidence" case); Cornell _____ _______ Univ. v. Velez, 856 F.2d 402, 404 (1st Cir. 1988) (similar); _____ _____ Sprague v. Director, OWCP, 688 F.2d 862, 865 (1st Cir. 1982) _______ _______________ (similar). Once White is placed into proper perspective, there is _____ little more to say. Even the Director agrees that diminished ____________________ 9If White stood for this proposition, the result would be an _____ awkward mitosis of the statutory definition. For purposes of assigning carrier liability, diagnosis would constitute disablement (defined by the LHWCA as an "incapacity because of injury to earn . . . wages." 33 U.S.C. 902(10)). Yet, for purposes of collecting compensation, diagnosis would not constitute such an incapacity (as even the Director does not contend that, as a matter of law, all workers diagnosed as having a disease are entitled to immediate receipt of incapacity benefits regardless of the work they are continuing to do or the wages they are continuing to earn). In short, were the Director's reading of White correct, an ALJ would initially have _____ to determine whether a diminishment in wage earning capacity of the first species had occurred and, thereafter, would have to answer the entirely different question of whether a diminishment in wage earning capacity of the second type had occurred. We do not think that White requires the statute to be construed in so _____ convoluted a fashion. 21 earning capacity is the appropriate indicium of disablement and that the date on which a worker suffers a diminution in earning capacity is the date of disablement for purposes of assigning carrier liability. The LHWCA unambiguously supports this view, see 33 U.S.C. 902(10) (defining disability), circuit precedent ___ reaffirms the proposition, see White, 584 F.2d at 575 (stating ___ _____ that "the test [for permanent partial disability] is diminishment of wage earning capacity"), the commentators agree, see, e.g., ___ ____ Larson, supra, 95.25(a),10 and the case law elsewhere is in _____ accord. See, e.g., Stevens v. Director, OWCP, 909 F.2d 1256, ___ ____ _______ ______________ 1259 (9th Cir. 1990), cert. denied, 111 S. Ct. 798 (1991); _____ ______ McBride v. Eastman Kodak Co., 844 F.2d 797, 798-99 (D.C. Cir. _______ __________________ 1988); Korineck v. General Dynamics Corp., 835 F.2d 42, 43 (2d ________ _______________________ Cir. 1987); Fleetwood v. Newport News Shipbuilding & Dry Dock _________ ______________________________________ Co., 776 F.2d 1225, 1229 (4th Cir. 1985). ___ Here, there is no claim that Libby's disease diminished his earning capacity prior to the time he was forced to leave work in 1985. To the contrary, the ALJ found an absence of any evidence that Libby suffered a diminution in earning capacity ____________________ 10According to Professor Larson: When the onset of disability is the key factor in assessing liability under the last- injurious-exposure rule, it does not detract from the operation of this rule to show that the disease . . . had become actually apparent, or had received medical treatment . . . so long as it had not resulted in disability. Larson, supra, 95.25(a) (citations omitted). _____ 22 prior to 1985. The Board affirmed this finding. Since the finding is solidly anchored in the record, the last insurer rule assigns liability to Liberty as the insurer at that time. III. III. ____ Conclusion Conclusion __________ In this case, all roads lead to Rome. Congressional intent, the efficient administration of the LHWCA, circuit precedent (properly read), and the better-reasoned authorities converge. We hold, therefore, that the date of disability, as determined by the date of decreased earning capacity, fixes liability as among successive insurers for LHWCA purposes. We need go no further. The petition to review is dismissed and the Board's decision is affirmed. Costs shall be taxed in favor of CUI. So Ordered. So Ordered. __________ 23