USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 96-2179 BATH IRON WORKS CORPORATION  and LIBERTY MUTUAL INSURANCE CO., Petitioners, v. DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Respondent. ____________________ PETITION FOR REVIEW OF A FINAL ORDER OF THE BENEFITS REVIEW BOARD ____________________ Before Boudin, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Bownes, Senior Circuit Judge. ____________________ ____________________ Kevin M. Gillis, with whom Troubh, Heisler & Piampiano, P.A. were _______________ _________________________________ on brief for petitioners. LuAnn B. Kressley, with whom J. Davitt McAteer, Acting Solicitor __________________ __________________ of Labor, Carol A. De Deo, Associate Solicitor for Employee Benefits, ________________ and Janet R. Dunlop, Counsel for Longshore, were on brief for _________________ respondent. ____________________ February 12, 1998 ____________________ BOWNES, Senior Circuit Judge. The Longshore and Harbor BOWNES, Senior Circuit Judge. ____________________ Workers' Compensation Act ("LHWCA" or "Act"), 33 U.S.C.A. 901 - 950 (West Supp. 1997), requires employers to pay compensation to certain maritime workers for disabling injuries resulting from their employment. An exception from total liability is provided to employers under 8(f) of the LHWCA when the employer proves, among other things, that a permanent partial disability existed prior to the work-related injury. 33 U.S.C.A. 908(f). In construing this exception, this court, along with other circuit courts of appeals, has required the employer to come forward with proof, which is not specifically elucidated in the statutory language, that the pre-existing disability was "manifest to the employer" before 8(f) relief can obtain. See Part II, infra.  ___ _____ In 1984 the LHWCA was amended, inter alia, to permit claimants to receive compensation when a long-latent occupational disease does not become apparent until after the employee has retired. This appeal presents a novel question in the wake of that amendment: may an employer obtain 8(f) relief when both the claimed pre-existing disability and compensable occupational disease do not become manifest until after the worker has retired from employment with the responsible employer? In such instances, of course, the employer cannot show that the pre- existing disability was "manifest to the employer" because employment has ceased by the time both disabilities arise. Because the question before us is purely legal, the facts underlying the worker's claim need only be sketched -2- 2 briefly. Phillip J. Reno voluntarily retired from Bath Iron Works ("BIW")1 in 1985, after a total of thirty-eight years2 in various positions. It is uncontroverted that at various stages of his employment at BIW, Reno was exposed to asbestos. In 1989 or 1990, several years after his retirement, Reno began to experience shortness of breath. He was diagnosed at that time with chronic obstructive pulmonary disease (emphysema) and interstitial lung disease. Reno had been a cigarette smoker. In June of 1991, Reno was referred to a pulmonary specialist who diagnosed obstructive pulmonary disease, primarily the result of cigarette smoking, and restrictive pulmonary disease resulting from Reno's asbestos exposure. Reno was assessed a twenty percent whole person impairment due to the overall pulmonary impairments. Reno filed a timely claim for workers' compensation benefits on the basis of his partial pulmonary disability. BIW in turn gave notice of its intent to seek relief from the compensation liability under 8(f) of the LHWCA on the theory that Reno's smoking-related emphysema was a permanent partial disability which predated the work-related injury of asbestosis. On December 3, 1993, the Administrative Law Judge ("ALJ") awarded benefits to Reno and denied BIW the 8(f) relief. Relying on our precedent, the ALJ held that in order to  ____________________ 1. We refer to Petitioners BIW and Liberty Mutual Insurance Company collectively as BIW. 2. We feel compelled to note that, contrary to BIW's description of Reno's work history, thirty-eight years is not properly characterized as "employ[ment] for several years." Br. of _______ Petitioner at 2 (emphasis added). -3- 3 obtain such relief, an employer must demonstrate that the pre- existing disability was manifest to the employer prior to retirement.  BIW appealed the legal basis of the 8(f) decision to the Department of Labor's Benefits Review Board. After no action, the ALJ's decision became the final order of the Board on September 12, 1996. See Omnibus Consolidated Rescissions and ___ ______________________________________ Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. at ___________________________ 1321-219 (April 26, 1996). Our jurisdiction over the appeal is proper under 33 U.S.C.A. 921(c). Because the issue before us is purely a question of law, we exercise de novo review. Liberty _______ Mut. Ins. Co. v. Commercial Union Ins. Co., 978 F.2d 750, 757 ______________ __________________________ (1st Cir. 1992). BIW posits that Reno's emphysema is a pre-existing permanent disability which, when combined with his occupational disease of asbestosis, created a greater disability. Based on this postulate, BIW points to both the plain language of 8(f), and the substance and legislative history of the 1984 Amendments to argue that it is entitled to relief under 8(f). In Newport _______ News Shipbuilding & Dry Dock Co. v. Harris, 934 F.2d 548 (4th __________________________________ ______ Cir. 1991), the Fourth Circuit examined a similar situation, and concluded that "adherence to the [manifestation] requirement [in instances of a long-latent occupational disease] would defeat the real purposes of the [1984] amendments," id. at 553. In cases ___ such as these, the Harris court determined that "the ______ manifestation requirement will not be applied." Id. BIW urges ___ -4- 4 adoption of the Harris holding,3 as a basis for overturning the ______ decision of the Board below. We decline to follow the Fourth Circuit and therefore affirm the decision of the Board. We find the manifestation requirement a necessary prerequisite to 8(f) relief even where the compensation claim is based on a post-retirement long-latent occupational disease. Our analysis follows. I.  I.  Under 8(f) of the Act, "the liability for permanent partial and permanent total disability, and death benefits, [is shifted] from employer to the Special Fund when the disability or death is not due solely to the injury which is the subject of the claim." A2 Benefits Review Board Service, Longshore Reporter ___________________ Desk Book D8.20, at 248 (Matthew Bender, 1996). In these _________ instances, after an initial period of employer liability, the employee is "paid the remainder of the compensation that would be due out of the special fund established in section 944 of" the LHWCA. 33 U.S.C.A. 8(f)(2)(A). The Special Fund is currently financed by assessments on all covered employers, part of which  ____________________ 3. Harris is the only circuit court of appeals decision to reach ______ this issue as of yet. In Ehrentraut v. Director, OWCP, 30 BRBS __________ ______________ 146 (1996), the Benefits Review Board reached the question, and decided that the pre-existing disability need only manifest itself to someone -- not necessarily the employer -- prior to the compensable injury, id. at 150. The Director has contested the ___ Board's jurisdiction to issue the opinion on the basis of Pub. L. No. 104-134, supra, and the case is currently pending before the _____ Third Circuit. Director, OWCP v. Sun Ship, Inc., No. 96-3648. ______________ ______________ Regardless, the Board's Ehrentraut decision is entitled to no __________ special deference here. Potomac Elec. Power Co. v. Director, ________________________ _________ OWCP, 449 U.S. 268, 278 n.18 (1980). ____ -5- 5 is prorated according to the extent to which that particular employer's compensated employees make use of the Fund. 33 U.S.C.A. 944(c). We turn initially to the words of the statute. If these are not clear, "we next examine the legislative history, albeit skeptically, in search of an unmistakable expression of congressional intent." Strickland v. Commissioner, Me. Dep't of __________ __________________________ Human Servs., 48 F.3d 12, 17 (1st Cir. 1995). ____________ Section 8(f) currently reads, in relevant part: Injury increasing disability: (1) In any case in which an employee ____________ having an existing permanent partial _____________________________________________ disability suffers injury, the employer shall __________ provide compensation for such disability as is found to be attributable to that injury based upon the average weekly wages of the employee at the time of the injury. If following [certain statutorily scheduled] . . . injur[ies] . . . , the employee is totally and permanently disabled, and the disability is found not to be due solely to that injury, the employer shall provide compensation for the applicable prescribed period of weeks provided for in that section for the subsequent injury, or for one hundred and four weeks, whichever is the greater . . . . In all other cases of total permanent disability or of death, found not to be due solely to that injury, of an employee having an existing permanent partial disability, the employer shall provide . . . compensation payments or death benefits for one hundred and four weeks only. If, following [a statutorily scheduled] injury . . . , the employee has a permanent partial disability and the disability is found not to be due solely to that injury, and such disability is materially and substantially greater than that which would have resulted from the subsequent injury alone, the employer shall provide compensation for the applicable period of weeks . . . , or for one hundred -6- 6 and four weeks, whichever is the greater . . . . In all other cases in which the employee has a permanent partial disability, found not to be due solely to that injury, and such disability is materially and substantially greater than that which would have resulted from the subsequent injury alone, the employer shall provide in addition to [statutorily mandated compensation], compensation for one hundred and four weeks only. 33 U.S.C.A. 908(f)(emphasis added).  Thus two categories of resulting disability are covered under 8(f): (1) total permanent disability found to be the result of the workplace injury (statutorily scheduled or otherwise) combined with the existing disability; and (2) partial permanent disability found to be the result of the workplace injury (statutorily scheduled or otherwise) combined with the existing disability, where the resulting disability is "materially and substantially greater" because of the combined effect. Reno's situation falls under the latter category. The first sentence of the section contains the language crucial to all requests for relief: 8(f) cases are those "in which an employee having an existing permanent partial disability suffers _____________________________________ injury." The statute, however, is silent on the meaning of "existing permanent partial disability." See 33 U.S.C.A. 902 ________ ___ (definitions). At first blush then, BIW's argument makes some sense; it is, at least, an arguable reading to suggest that Reno's emphysema was an "existing permanent partial disability" -7- 7 by the time the asbestosis made itself known. Leaving aside the question of when injury occurs for purposes of long-latent occupational diseases,4 the issue turns to a large degree on how one interprets the word "existing." For purposes of this appeal, does it mean existing during employment, or existing before another disability becomes apparent? The manifestation requirement, to which we now turn, was in large measure the result of courts' determinations on the meaning of "existing" disability. II. II. The font of the manifestation requirement can be traced to the Supreme Court's opinion in Lawson v. Suwanee Fruit & S.S. ______ ____________________ Co., 336 U.S. 198 (1949). There, the Court was asked to ___ determine the proper meaning of "disability" in the context of  8(f)'s coverage for "previous disabilit[ies]." Id. at 200. ___ Because the definitional portion of the LHWCA defined "disability" in relation to an injury "arising out of and in the course of employment," id. (quoting LHWCA 2(2)), a thorny ___ question of statutory interpretation emerged: must the "previous disability" also arise out of an employment-related injury? After a review of the Act's legislative history, id. at 201-04, ___  ____________________ 4. Our inquiry would be simplified if the statutory language explicitly defined the time of injury in such cases. Instead, the definition of "injury" includes "such occupational disease or infection as arises naturally out of such employment," 33 U.S.C.A. 902(2), and as we examine infra, wage calculations for _____ occupational disease reference the onset of disabling effect as the time of "injury," 33 U.S.C.A. 910(i). There is, therefore, room for argument on the point. -8- 8 the Court answered in the negative, id. at 206. "If we read the ___ definition [of disability] into 8(f)(1) in a mechanical fashion, we create obvious incongruities in the language, and we destroy one of the major purposes of the second injury provision: the prevention of employer discrimination against handicapped _________________________________________________________________ workers." Id. at 201 (emphasis added). It was Lawson _______ ___ ______ generally, and this emphasized language in particular which the courts of appeals have seized upon in developing the manifestation requirement.  In 1970, the D.C. Circuit interpreted 8(f) as it then existed,5 and formally extracted for the first time what has come to be known as the "manifestation" requirement -- requiring the employer to show that the pre-existing disability was manifest to the employer before 8(f) relief can obtain. American Mut. Ins. __________________ Co. of Boston v. Jones, 426 F.2d 1263 (D.C. Cir. 1970). Denying _____________ _____ 8(f) relief to the employer, the court stated that "nothing in the record gives any indication that [the claimant], up to the time of his [work-related] injuries, showed a sufficient degree of social maladaption due to limited intelligence that his disability could be fairly classed as 'manifest.'" Id. at 1268. ___ The American Mutual court's construction of 8(f) was informed _______________ by what it determined to be the primary purpose of the 8(f) exception: "to remove that aspect of discrimination against the  ____________________ 5. At the time, the language was "combin[ation] with a previous ________ disability." Longshoremen's and Harbor Workers' Compensation Act __________ 8(f)(1), 44 Stat. 1424, 1429 (1927) (emphasis added). We examine the lack of import in the language change infra. _____ -9- 9 disabled which would otherwise be encouraged by the very statute intended to protect them." Id. at 1267. Thus, it was reasoned, ___ "discrimination . . . must rest upon knowledge of the characteristic upon which the discriminationis to be based." Id. ___ It was not long before other circuit courts of appeals adopted the same requirement. See e.g., Dillingham Corp. v. _________ _________________ Massey, 505 F.2d 1126, 1128 (9th Cir. 1974); Atlantic & Gulf ______ ________________ Stevedores, Inc. v. Director, OWCP, 542 F.2d 602, 606 (3d Cir. ________________ ______________ 1976); Duluth, M. and I. R. Ry. Co. v. United States Dep't of ______________________________ _______________________ Labor, 553 F.2d 1144, 1148-51 (8th Cir. 1977).  _____ This court has required the employer to meet the manifestation requirement since General Dynamics Corp. v. ________________________ Sacchetti, 681 F.2d 37, 39-40 (1st Cir. 1982). We required a _________ showing of "manifest[ation] to the employer," because we observed that 8(f) "was designed to encourage employers to hire or continue to employ handicapped workers by ensuring that the employer would not have to compensate in full for a subsequently incurred permanent disability when that disability was attributable in part to a previously existing handicap." Id. We ___ have steadfastly adhered to this requirement. Director, OWCP v. _______________ General Dynamics Corp., 980 F.2d 74, 76 (1st Cir. __________________________ 1992)(Lockhart);6 Bath Iron Works Corp. v. Director, OWCP, 950 ________ ______________________ _______________ F.2d 56, 58 (1st Cir. 1991); CNA Ins. Co. v. Legrow, 935 F.2d _____________ ______  ____________________ 6. Because of the fact that the parties litigating disputes under the LHWCA are frequently the same, courts generally use the last name of the individual claimant for purposes of short-form citation, regardless of whether that claimant is a party to the appeal. We do so here. -10- 10 430, 435 (1st Cir. 1991); White v. Bath Iron Works Corp., 812 _____ ______________________ F.2d 33, 35 (1st Cir. 1987); Director, OWCP v. General Dynamics ______________ ________________ Corp., 787 F.2d 723, 725 (1st Cir. 1986)(Fantucchio). See also _____ __________ ________ Director, OWCP v. Bath Iron Works Corp. (Johnson), 129 F.3d 45, ______________ _____________________ _______ 50 (1st Cir. 1997)(reiterating non-discrimination purpose behind 8(f)). Our current jurisprudence therefore dictates that, in order "[t]o prove that it is entitled to Section 8(f) relief, an employer must show that, (1) the employee had a permanent partial disability that existed prior to the second injury; (2) the second injury contributed to that disability; and (3) the prior disability was 'manifest' to the employer." Lockhart, 980 F.2d ________ at 76. As we have noted, we turned to what has been consistently elucidated as the core purpose of 8(f) -- prevention of discrimination -- to inform our adoption of the manifestation requirement. Sacchetti, 681 F.2d at 40. Indeed, _________ our most extensive analysis of the manifestation requirement to date reiterated that the "crucial issue [in 8(f) relief], . . . is the potential for discrimination against the disabled." Lockhart, 980 F.2d at 81. We stated that "[t]he centrality of ________ this issue is emphasized in all our cases interpreting the [LHWCA]." Id. The challenged standard employed by the Board in ___ Lockhart's case, which involved a question concerning the permanency of the pre-existing disability, queried whether there was "sufficient information regarding the existence of a serious lasting problem which would motivate a cautious employer to -11- 11 consider terminating the employee." Id. at 80. We held the ___ standard proper because "[i]t effectuates the purpose of the manifest requirement and Section 8(f) by making only potential discriminators eligible for Section 8(f) relief." Id. at 82. ___ To date, eight other circuits besides ours apply this requirement: the Second, Third, Fourth, Fifth, Eighth, Ninth, Eleventh and District of Columbia. Sealand Terminals, Inc. v. ________________________ Gasparic, 7 F.3d 321, 323 (2d Cir. 1993)(per curiam); Director, ________ _________ OWCP v. Universal Terminal & Stevedoring Corp., 575 F.2d 452, 455 ____ ______________________________________ (3d Cir. 1978); Director, OWCP v. Newport News Shipbuilding & Dry ______________ _______________________________ Dock Co. (Langley), 676 F.2d 110, 114 (4th Cir. 1982); Ceres _________ _______ _____ Marine Terminal v. Director, OWCP, 118 F.3d 387, 392 (5th Cir. _______________ ______________ 1997); Duluth, 553 F.2d at 1149-51 (8th Cir. 1977); Director, ______ _________ OWCP v. Cargill, Inc., 709 F.2d 616, 618-19 (9th Cir. 1983)(en ____ _____________ banc); C.G. Willis, Inc. v. Director, OWCP, 31 F.3d 1112, 1115 __________________ ______________ (11th Cir. 1994); C & P Tel. Co. v. Director, OWCP, 564 F.2d 503, ______________ ______________ 512-15 (D.C. Cir. 1977). Only the Sixth Circuit has rejected the manifestation requirement, substituting instead the directive that the pre-existing disability be manifest to someone -- not necessarily the employer -- prior to the work-related injury. American Ship Bldg. Co. v. Director, OWCP, 865 F.2d 727, 732 (6th _______________________ ______________ Cir. 1989). To say that the requirement is by now well-ensconced within the rubric of the LHWCA would be an understatement. We must note, however, that despite the Benefits Review Board's description of the manifestation requirement as a "well-settled -12- 12 concept," Caudill v. Sea Tac Alaska Shipbuilding, 25 BRBS 92, 99 _______ ___________________________ (1991), the Supreme Court has not yet decided its validity. III. III. The manifestation requirement has been properly characterized as "a 'judicial gloss' which Congress has not acted to erase." American Shipbuilding, 865 F.2d at 730. Nor _____________________ could we erase it if we wanted to. It is well settled that, "[i]n a multi-panel circuit, newly constituted panels, generally speaking, are bound by prior panel decisions on point." Metcalf & _________ Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth., 991 F.2d 935, __________ ____________________________________ 939 n. 3 (1st Cir. 1993). We are, however, confronted with a situation made novel by congressional amendment, and must therefore determine whether those amendments should effectuate a change in our traditional analysis of requests for 8(f) relief. As an initial matter, we remain convinced that application of the manifestation requirement to requests for  8(f) relief is the proper way to give the Section its intended meaning. We think the LHWCA's legislative history shows that  8(f) was designed to serve a very specific and limited purpose with regards to the operation of the compensation scheme as a whole. Because the manifestation requirement effectuates this limited purpose, we affirm our adherence to it. A. A. The original LHWCA was passed in 1927 in response to a series of Supreme Court decisions that invalidated prior attempts to cover maritime workers under existing state compensation -13- 13 structures. See G. Bober & M. Wible, Compensable Injury or Death ___ ___________________________ Arising Under the Longshore and Harbor Workers' Compensation Act, ________________________________________________________________ 35 Loyola L. Rev. 1129, 1131 (1990). "It was held that the matter [of maritime compensation] was outside state cognizance and exclusively within federal maritime jurisdiction . . . ." Calbeck v. Travelers Ins. Co., 370 U.S. 114, 117 _______ ______________________ (1962)(discussing Southern Pac. Co. v. Jensen, 244 U.S. 205 ___________________ ______ (1917)).7 Around the time the LHWCA was debated and crafted, workers' compensation schemes had become so popular that "[b]y 1920, all but eight states had adopted Compensation Acts." A. Larson, The Nature and Origins of Workmen's Compensation, 37 ___________________________________________________ Cornell L. Q. 206, 233 (1952). One of the major problems with state workers' compensation schemes, however, was the effect that "non- apportionment" of the cost of compensation had on the already disabled worker. By holding the last employer liable for the results of accumulated injury, it was argued, employers had a significant incentive to discriminate against those workers already physically disabled.8 Johnson, 129 F.3d at 50. The most _______ commonly reiterated example of this effect derives from the Oklahoma experience. As stated in Lawson, ______  ____________________ 7. Justice Brennan's opinion in Calbeck provides a comprehensive _______ discussion of the judicial decisions and legislative maneuvering which led to passage of the Act. 370 U.S. 117-124. 8. "Non-apportionment" is also described as the "aggravation rule," because it holds one employer liable for the results of an aggravating injury.  -14- 14 Nease v. Hughes Stone Co., 114 Okla. 170, 244 _____ ________________ P. 778 [(1925)], held the employer liable for total compensation for loss of the second eye. After the decision, Mr. Huber [of Oklahoma] reports, "thousands of one-eyed, one-legged, one-armed, one-handed men in the State of Oklahoma were let out and can not get employment coming under the workmen's compensation law of Oklahoma. . . . Those . . . court decisions put us in bad shape. . . . The decision displaced between seven and eight thousand men in less than 30 days in Oklahoma." 336 U.S. at 203-04 (quoting United States Bureau of Labor Statistics, Bull. No. 536 at 268, 272 (1931))(first two alterations added). As one example of the flavor of the debate, it was stated that compensation systems without second injury provisions, "would become an instrument of persecution . . . of men who are physically handicapped." Id. at 203 (quoting ___ testimony of Joseph Parks of Massachusetts Industrial Accident Commission, United States Bureau of Labor Statistics, Bull. No. 564 at 278 (1932)). As originally enacted, an employer was entitled to  8(f) relief "[i]f an employee receive[d] an injury which of itself would only cause permanent partial disability but which, combined with a previous disability, does in fact cause permanent total disability." 44 Stat. at 1429. The legislative history of the Act demonstrates that Congress responded to the unintended effect of non-apportionment by including a "second injury fund" in the statute. See Johnson, 129 F.3d at 50 (stating that ___ _______ conclusion); Ceres Marine, 118 F.3d at 389 (same). Although the ____________ legislative history of the original Act is not voluminous, what -15- 15 does exist drives our conclusion that 8(f) was included in the LHWCA specifically to ameliorate the effects of non- apportionment. Discriminatory effect was certainly seriously considered. For instance, Representative Bowling stated during a colloquy on a potential apportionment scheme that even under such a system, the disabled employee was likely to remain jobless. To __ Provide Compensation for Employees Injured and Dependents of _________________________________________________________________ Employees Killed in Certain Maritime Employments: Hearings on _________________________________________________________________ H.R. 9498 Before the House Committee on the Judiciary, 69th ___________________________________________________________ Cong., 1st Sess. at 74 (1926) ("Well, that sounds like 'good-by' [sic] for the [disabled employee]").  Perhaps the most telling exchange on point occurred during hearings over the Senate version of the bill, which would later be enacted. Mr. E. M. Braxton of the Newport News Shipbuilding & Dry Dock Company reiterated his concern that the Act would require employers to "examine every man who applies for work; and the poor dog that is suffering from some disease will be turned away from our plant because . . . as a matter of life and death financially we will have to turn him down." Hearings ________ on S.3170 Before the House Committee on the Judiciary, 69th __________________________________________________________ Cong., 1st Sess. at 196 (1926). In rebuttal, a witness in favor of the legislation testified as follows: The second injury proposition is as much to the advantage of the employer and his interests as it is for the benefit of the employee. It protects that employer who has hired, say, a one-eyed worker who goes and loses his other eye and becomes a total disability. The employer without this sort of thing would have to pay total permanent -16- 16 disability compensation. Then, on the other hand, this also protects the worker with one eye from being denied employment on account of his being an extra risk. Now by simply taking this up in this way it is possible to protect both the employer and to protect the one-eyed employee also. It is one of the best social inventions in legislation of which I have knowledge. Id. at 208 (testimony of Mr. Andrews). See also Lawson, 336 U.S. ___ ________ ______ at 202 (quoting same). We think the foregoing demonstrates that the development of the manifestation requirement rests on solid ground. Because the legislative history of the original Act demonstrates that 8(f) was specifically designed to reduce the incentive for discrimination, it makes logical sense that "only potential discriminators [are] eligible for Section 8(f) relief." Lockhart, 980 F.2d at 82. ________ B. B. In 1972, the LHWCA was amended,9 see Longshoreman's and ___  ____________________ 9. There were, of course, other amendments to the Act prior to 1972. According to one Report generated as part of the 1984 Amendments, [O]ther employee groups were [eventually] covered under the Act. The District of Columbia Workmen's Compensation Act (1928) extended coverage to employees of private employers in Washington, D.C. The Defense Base Act (1941) extended coverage to employees of federal contractors at military bases or on public works contracts performed in any place outside the continental United States. The Nonappropriated Fund Instrumentalities Act (1952) applied the LHWCA to civilian employees of nonappropriated fund instrumentalities of the Armed Forces (such as post exchanges). In 1953, the Outer Continental Shelf Lands Act extended coverage to employees on the U.S. Outer Continental Shelf involved in exploring for and developing natural resources. -17- 17 Harbor Workers' Compensation Act Amendments of 1972, Pub. L. 92- 576, 86 Stat. 1251 (1972), "[t]he principle purpose of . . . [which was] to . . . upgrade the benefits, extend coverage to protect additional workers, provide a specified cause of action for damages against third parties, and to promulgate necessary administrative reforms," S. Rep. No. 92-1125, at 1 (1972). As part of the 1972 Amendments, the language of 8(f) was changed, substituting the language of "previous disability" for the current language of "existing permanent partial disability." 86 Stat. at 1257. The Amendments also opened the door for employers to 8(f) relief where the resulting combined disability was not total, but partial. Id. ___ There is nothing in the legislative history of the 1972 Amendments to suggest that the core purpose of 8(f) was being altered along with its language. See Duluth, 553 F.2d at 1149 ___ ______ (making that determination); C & P Telephone, 564 F.2d at 512 ________________ (same). To the contrary, both the Senate and House Report stated that the chosen "method of spreading the risk among all employers is intended by the committee to encourage the employment of handicapped workers." S. Rep. No. 92-1125, at 7; H.R. Rep. No. 92-1441, at 8 (1972).   ____________________ Since original enactment, the Act has been amended ten times. Amendments in 1934, 1938, 1948, 1956, 1960, 1961, and 1969 revised or increased benefits. In 1958, the Act was amended to require employers to maintain a reasonably safe work environment. S. Rep. No. 97-498, at 20 (1982). -18- 18 IV. IV. BIW's primary argument is that the 1984 Amendments to the Act, Pub. L. No. 98-426, 98 Stat. 1639 (1984), required abolishing the application of the manifestation requirement to  8(f) requests in cases where an occupational disease or injury does not appear until after employment has ceased. One of the principles of statutory interpretation is that a "settled construction of an important federal statute should not be disturbed unless and until Congress so decides." Reves v. Ernst _____ _____ & Young, 494 U.S. 56, 74 (1990)(Stevens, J., concurring). We _______ recognize that "considerations of stare decisis weigh heavily in _____ _______ the area of statutory construction, where Congress is free to change [the courts'] interpretation of its legislation." Illinois Brick Co. v. Illinois, 431 U.S. 720, 736 (1977).  __________________ ________ Although the Amendments added a provision permitting such claims "if filed within two years after the employee or claimant becomes aware, or . . . should have been aware, of the relationship between the employment" and the disease, 98 Stat. at 1649 (codified at 33 U.S.C.A. 913(b)(2)), we can find nothing in the text of the Amendments, nor its legislative history, to suggest that Congress intended to alter the application of the manifestation requirement to requests for 8(f) relief.  The Harris court seized upon, and BIW directs us to, ______ language in a House Report as a basis for its argument that  8(f) applies to a pre-existing disability not manifested until after the employee has stopped working. Harris, 934 F.2d at 552. ______ -19- 19 As part of the introductory summary of the bill, the Report stated that the Amendments were "intended to reduce the cost of Longshore coverage for employers in the covered industries in a manner which will disturb, to the most limited extent possible, the rights and benefits which the Longshore Act provides." H.R. Rep. No. 98-570, at 3 (1983), reprinted in 1984 U.S.C.C.A.N. ____________ 2734, 2736. Thus, the Harris court deduced that an expansion of ______ an individual's right to file a claim should be coupled with corresponding relief for the employer. 934 F.2d at 552. But review of the entirety of that House Report, and other legislative documents, demonstrates that the quoted language cannot support the weight ascribed to it. First, there is compelling evidence that Congress was well aware of, and in fact endorsed, application of the manifestation requirement to 8(f) cases. A Senate Report states that "[a]n employer able to demonstraate [sic] actual or, ______ in some cases, constructive knowledge that an injured worker had ______________________ a permanent disability which pre-dated a compensable injury is often able to shift to the Special Fund the responsibility for paying a very substantial portion of the amounts payable to the worker." S. Rep. No. 97-498, at 35 (1982)(emphases added); see ___ also S. Rep. No. 98-81, at 34 (1983)(same). We think this ____ language is most reasonably read as referring to the manner in which courts of appeals had analyzed disputes concerning 8(f) - - by requiring a showing of actual or constructive knowledge with evidence of "manifestation." Similarly, the House and Senate -20- 20 Reports on the 1984 bill expressly recognized that "[s]ection 8(f) of the Act was designed to encourage employers to hire and retain disabled workers by distributing much of the additional cost of industrial injury attributable to pre-existing permanent disabilities among all employers and carriers subject to the Act." S. Rep. No. 97-498, at 34-35; S. Rep. No. 98-81, at 34 (same language). Thus "[t]he goals of Section 8(f) remain[ed] valid," S.Rep.97-498, at35, aspartand parcelofthe 1984Amendments. Ultimately fatal to BIW's position is evidence concerning how Congress conceptualized its amendment allowing claims for long-latent occupational diseases. Consider the following language from the House Report: The first change to the body which results from exposure to a harmful physical agent or a toxic substance often is not disabling. Since it is the disability which should trigger the compensation claim, the Committee notes that unlike traumatic occurrences, the ___ period of time between the 'injury' and the _____________________________________________ arising of a compensation claim in such a __________________________________ long-latency occupational disease case may be so long as to make the requirement that the employee file a Notice of Injury within thirty days of the 'injury' nonsensical. . . . To the same effect, triggering the statute of limitations for the filing of compensation claims on the date of 'injury' makes little sense in the context of an occupational __________________________________ disease in which the disabling condition or _____________________________________________ the death does not follow immediately on the _____________________________________________ "injury." ________ H.R. Rep. No. 98-570, at 10-11 (emphases added).  What is important here is that in crafting this particular amendment concerning occupational disease, Congress -21- 21 conceptualized the "injury" as occurring at the time of exposure to the causative agent, which would necessarily have to occur during employment. At the very least, this Report language precludes the argument that Congress was removing the manifestation requirement in instances involving these new occupational disease claims. Because the "injury" was conceived as occurring during employment, 8(f) retained its regular meaning -- applying when "an employee having an existing permanent partial disability suffers injury." 33 U.S.C.A.  8(f)(1).  This Report language is affirmed by the amended statutory language itself; and we must read statutes as a whole, rather than focus on isolated phrases. Conroy v. Aniskoff, 507 ______ ________ U.S. 511, 515 (1993). As part of the occupational disease amendment, there also had to be a determination made as to how to calculate the amount of compensation paid in such cases. Because the existing formula generally calculated compensation in reference to "the average weekly wage . . . at the time of the injury," 33 U.S.C.A. 910, there was concern that very long- latent diseases would leave disabled retirees in an unfair economic situation because wages increased over time, H.R. Rep. No. 98-570, at 11-12. It was therefore decided that in such instances, "the time of injury shall be deemed to be the date on ______ which the employee becomes aware, or . . . should have been aware, of the relationship between the employment, the disease, and the death or disability." 98 Stat. at 1647-48 (codified at -22- 22 33 U.S.C.A. 910(i))(emphasis added). Thus, by establishing the time of injury at a time closer to the onset of the disabling symptoms for purposes of wage calculation, Congress implicitly recognized that the injury-in-fact to the physical body occurred during the occupational exposure, but did not become disabling until later. Although the 1984 Amendments were most certainly designed in part to "reduce the cost of . . . coverage for employers in the covered industries," H.R. Rep. 98-570, at 3, quoted in Harris, 934 F.2d at 552, they did so in a multitude of _________ ______ ways.10 Providing 8(f) relief to employers under facts such as these was simply not one of them.  We point out additional authority for our ruling. Just after the 1984 Amendments, the Department of Labor amended the regulations interpreting the LHWCA to include, for the first time, the manifestation requirement. 50 Fed. Reg. 401 (1985), amended, 51 Fed. Reg. 4285 (1986)(codified at 20 C.F.R.  702.321(a) (1)(1997)). Thus, if we found that the legislative history provided guidance less clear than it does, we would have little trouble deferring to the Department's interpretation, given our finding -- in Part III, supra -- that the manifestation _____ requirement "is based on a permissible construction of the statute." Chevron U.S.A. Inc. v. Natural Resources Defense ____________________ __________________________ Council, Inc., 467 U.S. 837, 843 (1984). _____________  ____________________ 10. For example, the definition of "employee" was modified to exclude clerical workers and others whose "work does not expose them to traditional maritime hazards." H.R. Rep. No. 98-570, at 3; see 98 Stat. at 1639.  ___ -23- 23 The argument has also been made that, in instances such as these, the manifestation requirement serves no useful purpose because there is no potential for discrimination where the employee has already retired. It is not, however, the manifestation requirement that has an anti-discrimination purpose, but 8(f) which has such a purpose. The requirement is only a judicially created tool, developed in order to help determine when the purpose of 8(f) is being served. As our analysis demonstrates, 8(f) was designed for a very specific reason -- to remove the discriminatory incentive created by holding the last employer liable for the results of an aggravating injury. The manifestation requirement ensures that requests for 8(f) relief remain within the intended scope of the Section. The requirement is not an additional hurdle, but rather an integral part of 8(f). We are therefore not at liberty to either apply or discard the requirement as different facts are presented, especially in the absence of congressional directive.  We do not think it is either unreasonable or unfair to preclude access by the employer to the Special Fund under the facts of this case. There can be little doubt that Reno was exposed to asbestos during his working career at BIW, and BIW has not contested that Reno's exposure to asbestos during his employment at BIW caused his asbestosis. They are therefore properly liable for the results of this work-related injury. -24- 24 Because they have not met their burden of establishing a right to 8(f) relief, the decision of the Board is affirmed.  affirmed. _________ -25- 25