

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-29-1998

# Director OWCP v. Sun Ship Inc

Precedential or Non-Precedential:

Docket 96-3648

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation
"Director OWCP v. Sun Ship Inc" (1998). *1998 Decisions.* Paper 175.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/175

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 29, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 96-3648

DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,
        Petitioner

v.

SUN SHIP, INC.

(GERTRUDE EHRENTRAUT, Claimant)

On Appeal From the Benefits Review Board,
United States Department of Labor
93-1600

Argued: December 1, 1997

Before: COWEN, McKEE & ROSENN, Circuit Judges

(Filed: July 29, 1998)

J. DAVITT MCATEER
Acting Solicitor of Labor
ALLEN H. FELDMAN
Associate Solicitor for Labor
 Special Appellate
and Supreme Court Litigation
JOSHUA T. GILLELAN, II
Room S-4325
JUDITH D. HEIMLICH (ARGUED)
U.S. Department of Labor
Room N-2700
200 Constitution Ave., N.W.
Washington, D.C. 20210

 Attorneys for Petitioner

JOHN P. DOGUM, Esq. (ARGUED)
Swartz, Campbell & Detweiler
1601 Market Street
34th Floor
Philadelphia, PA 19103

 Attorney for Respondent

OPINION OF THE COURT

McKEE, Circuit Judge

We are asked to determine if the delay of the Board of Revision and Review in reviewing a decision of an administrative law judge deprived the Board of jurisdiction under the facts of this appeal. We hold that it did, and that the Board's delay caused the ALJ's decision to become a final order that we now have jurisdiction to review. We further hold that the ALJ erred in deciding that a maritime employer is entitled to relief from the Special Fund established under S 8(f) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. S 901, et seq. ("LHWCA") ("the Act"), where the employee's disability was not manifest during the time of his employment. Accordingly, we will reverse the decision of the ALJ.

2

I. BACKGROUND

Raymound Ehrentraut worked for Sun Ship, Inc. from 1938 until his retirement in 1981. Nine years after he retired he was diagnosed with asbestosis resulting from his years of work-related asbestos exposure while at Sun Ship. The same month he was diagnosed, doctors discovered he also had a work-related pulmonary malignancy. Ehrentraut's asbestosis was a "pre-existing condition" that had made diagnosis of the malignancy more difficult. Ehrentraut eventually succumbed to the cancer and died on July 15, 1990. Thereafter, his wife applied to Sun Ship for death benefits under the Longshore and Harbor Workers' Compensation Act.1

Sun Ship initially paid the requested benefits. However, in 1992, after paying benefits for 104 weeks, Sun Ship requested the Office of Workers' Compensation Programs to provide the payments from the Special Fund established under section 8(f) of the Act, 33 U.S.C. S 908(f). The Director of the Office of Workers' Compensation Programs denied Sun Ship's application. The Director concluded that Sun Ship was not eligible for relief from the Special Fund because Ehrentraut's pre-existing injury was not manifest while he worked for Sun Ship. However, the case was referred to an administrative law judge who overruled the Director's decision. On April 15, 1993, the ALJ issued an opinion declaring that Sun Ship was entitled to section 8(f) relief under the 1984 amendments to the Act because Ehrentraut's pre-existing condition was a long-latency disease diagnosed after Ehrentraut's retirement. See ALJ at 3.

The Director filed a timely appeal to the Benefits Review Board on May 13, 1993. However, the Board failed to adjudicate the appeal for more than three years. Finally, on September 12, 1996, the Board issued an order in which it reversed the ALJ's ruling and remanded the case back to the ALJ for further proceedings. The Director filed a Petition for Review seeking a judicial determination that the ALJ's order had become the final decision of the Board because

_____

1. Both parties agree that she is entitled to death benefits under 33 U.S.C. S 909.

the Board had not acted within the required time frame. The Director's petition asks us to reverse the ALJ's decision and hold that Sun Ship is not entitled to shift the responsibility for these benefits to the Special Fund.

## II. STANDARD OF REVIEW

We exercise plenary review over both the jurisdictional issue and the substantive issue raised by this appeal because both present questions of law. Director, Office of Workers' Compensation v. Barnes and Tucker Co., 969 F.2d 1524, 1527 (3d Cir. 1992); cf. Sea-Land Service, Inc. v. Rock, 953 F.2d 56, 59 (3d Cir. 1992). Before addressing the substance of the Director's petition, we must first resolve the issue of our jurisdiction.

For the reasons that follow, we conclude that we have jurisdiction to review the ALJ's decision as the Board's final order. We hold that the ALJ erred in concluding that Sun Ship is entitled to shift liability to the Special Fund that Congress created under section 8(f) of the Act.

## III. JURISDICTION

Ordinarily, the Board's remand to the ALJ would be an interlocutory order and we would therefore have no jurisdiction to review it. However, the Department of Labor Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (the "Appropriations Act") provides that any ALJ decision in a LHWCA case that has been

> pending a review by the Benefits Review Board for more than one year shall, if not acted upon by the Board before September 12, 1996, be considered affirmed by the Benefits Review Board on that date, and shall be considered the final order of the Board for purposes of obtaining a review in the United States courts of appeals.

100 Stat. 1321-219 (emphasis added). Here, the Board issued its order on September 12, 1996. Sun Ship argues that is consistent with the requirements of the Appropriations Act. The Director responds that "before"

4

does not mean "on" and that the Board's September 12, 1996 decision is therefore a nullity.

It is axiomatic that our interpretation of any statute begins with the language of the statute. Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). If the language is ambiguous, we look to legislative history to determine congressional intent. Adams Fruit Co., Inc. v. Barrett, 494 U.S. 638, 642 (1990). In addition, we will sometimes defer to a permissible interpretation of a statute by an appropriate agency. However, we will do so only when the statute does not directly speak to the issue and congressional intent cannot be gleaned from the text of the statute, or its legislative history. Only then, should the "question for the court [become] whether the agency's answer is based on a permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). When legislation speaks directly to a particular issue, it is that congressional expression, not a contradictory agency interpretation, which controls. See, e.g., Rubin v. United States, 449 U.S. 424, 430 (1981).

Here, it is clear that the Board's decision is void if it did not comply with the Appropriations Act. We would then have jurisdiction under the Appropriations Act to review the ALJ's decision. However, Sun Ship argues that the Board obviously interpreted the Appropriations Act as allowing it to issue orders on September 12, 1996 because the Board issued several opinions on that day that had been pending for over a year. Sun Ship then relies upon Chevron to argue that we must defer to the Board's interpretation.2 However,

_____

2. According to Sun Ship, the Board obviously interpreted the Appropriations Act as allowing it to act on September 12, and we must defer to that interpretation under Chevron. Chevron does state that a court should refrain from "substituting its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency," 467 U.S. at 844, however, we have not previously directly addressed the issue of the amount of deference owed the Director concerning the interpretation of the LHWCA. In Cort v. Director, Office of Workers' Compensation Programs, 996 F.2d 1549, 1551–52 (3d Cir. 1993), we recognized a division of authority among the

5

Sun Ship's position ignores the well-settled rule that we do not defer to the Board's interpretation of statutes. See Commonwealth of Pennsylvania v. United States Dep't of Health & Human Serv., 80 F.3d 796, 809 (3d Cir. 1996) (citing Sharondale Corp. v. Ross, 42 F.3d 993 (6th Cir. 1994)); cf. Elliot Coal Mining v. Director, Office of Workers' Compensation, 17 F.3d 616, 627-28 (3d Cir. 1994). Moreover, here, the Board's interpretation is contrary to the express language of the Appropriations Act. Accordingly, we will not defer as Sun Ship urges.

Sun Ship also contends that the Appropriations Act, taken as a whole, is ambiguous, and that this "ambiguity" requires us to look beyond the plain meaning of the language to determine Congress' true intent. Sun Ship attempts to create ambiguity by referring to other provisions in the Appropriations Act that allow for action "after September 12[th]," or "beginning September 13th," rather than "before September 12th." For example, the statute provides that:

> . . . no funds made available by this Act may be used by the Secretary of Labor after September 12, 1996 to review a decision under the [LHWCA] that has been appealed and that has been pending before the Benefits Review Board for more than 12 months, except as otherwise specified herein . . . beginning on September 13, 1996, the Benefits Review Board shall make a decision on appeal of a decision under the [LHWCA] no later than 1 year after the date the appeal to the Benefits Review Board was filed.

110 Stat. 1321. (emphasis added).

_____

circuit courts of appeals concerning the amount of deference afforded the Director, but we did not reach the issue. In Barnes & Tucker, we held that we "owed . . . deference to the Director, not to the Board, for the Director makes policy." Id. at 1527. However, both Barnes & Tucker and Elliot Coal Mining v. Director, Office of Workers' Compensation Programs, 17 F.3d 616, 626 (3d Cir. 1994) stand for the well established proposition that we "will not defer to an interpretation in an adversarial proceeding that strains the `plain and natural meaning of words'." Barnes & Tucker, 969 F.2d at 1527.

6

Such language does not render the Appropriations Act either ambiguous, or contradictory. The Act did not prevent the Board from acting on all matters on September 12th. Rather, the Board was merely prohibited from acting on September 12 to decide or dispose of matters that had then been pending for a year or more. This did not prevent the Board from deciding cases on September 12, 1996 that had been pending for less than one year as of that date. Similarly, beginning on September 13, 1996, the Appropriations Act established a one year cut-off date within which the Board had to resolve cases pending before it. Neither provision requires us to interpret "before" September 12, to mean "on or before" September 12, as Sun Ship urges. When "before" is used as a preposition, it refers to "an event or act preceding in time or earlier than, or previously to, the time mentioned." Blacks Law Dictionary, 154-55 (6th ed. 1990). References to "after September 12th" only address the disbursal of funds.

It is difficult to imagine how Congress could have more clearly established the Board's deadline for acting. Congress decreed that the Board must act "before September 12th." In United States v. Locke, 471 U.S. 84, 93-96 (1985), the Court held that a statutory requirement to act "prior to December 31" plainly meant that action had to be undertaken before that date and not on it. The same is true here.[3]

On September 12, 1996 this case had been pending before the Benefits Review Board for more than three years. The Board failed to act before September 12, and its subsequent decision on September 12 is, therefore, a nullity under the Act. That conclusion is required by the language of the statute, and we have been directed to nothing in the legislative history that would suggest a different result. Thus, a contrary interpretation of the

_____

3. In Finkle v. Gulf & Western Mfg. Co., 744 F.2d 1015 (3d Cir. 1984), in a quite different context, we interpreted the phrase "prior to a certain date." We held that language providing a specific date by which action is required is "unequivocal and establishes an enforceable renewal deadline." Id. at 1019. Although we were concerned with the provisions of an option contract, our analysis there is nevertheless helpful to our analysis of the meaning of the statute we interpret here.

Appropriations Act would have the effect of amending it to read "on or before September 12, 1996." Any such change must originate in Congress, not here. Accordingly, the Board's purported remand was a nullity, and the ALJ's grant of section 8(f) relief to Sun Ship became a final order that we can now review.

IV. DISCUSSION

A. The Special Fund Under S 8(f)

Section 8(f) of the Act provides that when an employee with a pre-existing condition suffers an on-the-job injury or is afflicted with a work-related disease which, in combination with the pre-existing condition,4 causes a more severe, permanent disability, the employer can apply to the Director for relief from disability payments after the employer has made such payments to the employee for 104 weeks. See 33 U.S.C. S 908(f)(1).

The relevant text of the statute reads as follows:

> In any case in which an employee having an existing permanent partial disability suffers injury, the employer shall provide compensation for such disability as is found to be attributable to that injury based upon the average weekly wages of the employee at the time of the injury. If following an injury falling within the provisions of subsection (c)(1)-(20) of this section, the employee is totally and permanently disabled, and the disability is found not to be due solely to that injury, the employer shall provide compensation for the applicable prescribed period of weeks provided for in that section for the subsequent injury, or for one hundred and four weeks, whichever is the greater . . . .

> In all other cases in which the employee has a permanent partial disability, found not to be due solely to that injury, and such disability is materially and

_____

4. There is no requirement that the pre-existing condition be work-related. Lawson v. Suwanee Fruit & Steamship Co., 336 U.S. 198, 204 (1949).

8

substantially greater than that which would have resulted from the subsequent injury alone, the employer shall provide in addition to compensation under subsections (b) and (e) of this section, compensation for one hundred and four weeks only.

33 U.S.C. S 908(f)(1).

The Special Fund was established in 1927 with the enactment of the LHWCA. It was created by 33 U.S.C. S 944, and was intended to spread liability for injuries sustained by employees with pre-existing conditions equally among all employers in the maritime industry.5

> The Special Fund was originally enacted . . . to fund expenditures [where] an employee received an injury which alone caused only permanent partial disability, but resulted in the employee's permanent disability when combined with a previous disability, the employer had to provide compensation for the disability caused by the second or subsequent injury . . . .[T]he employee would be paid the remainder of his compensation for permanent total disability out of the Special Fund . . .

Smith, The Special Fund Under The Longshore And Harbor Workers' Compensation Act, 11 Mar. Law 71 (1986). The LHWCA was enacted "in response to a series of Supreme Court decisions that invalidated prior attempts to cover maritime workers under existing state compensation structures." Bath Iron Works Corp. v. Director, Office of Workers' Compensation, 136 F.3d 34, 40 (1st Cir. 1998). Those decisions resulted in a situation where the last employer was liable for injuries that became totally disabling only as a result of preexisting injuries for which the last employer had no responsibility, and over which, it had no control. The Supreme Court discussed this situation

_____

5. Contribution to the Special Fund is mandatory for all maritime industry employers. Annual assessments are determined using the ratio of the employer's compensation payments under the LHWCA to the total compensation paid by all employers under the LHWCA. 33 U.S.C. S 944(c)(2); see also Lawrence P. Postol, The Federal Solution to Occupational Disease Claims -- The Longshore Act and Federal Program 21 Tort & Inc. L.J. 199, 229-30 (1996) (explaining how formula is utilized).

in Lawson v. Suwanee Fruit & S. S. Co., and the modern interpretation of section 8(f) can be traced directly to that decision. In Lawson, an employee had lost the sight of one eye in an accident not connected to the maritime industry. He was later hired by a steamship company and thereafter injured in a work related accident that took the sight of the other eye leaving him totally blind, and permanently disabled. However, since the total disability did not result solely from maritime employment, an issue arose as to the scope of the maritime employer's liability for the total disability. The Court defined the issue as follows: "should the employer or the second injury fund6 . . . be liable for the balance of payments to equal compensation for total disability?" Id.

The Court noted the problems caused by earlier decisions holding the last employer fully responsible for the effects of a second injury although total disability only resulted from the combined effect of the latter injury and a preexisting condition. In particular, the Court noted the prior decision of the Oklahoma Supreme Court in Nease v. Hughes Stone Co., 114 Okl. 170 (Okla. 1925), where the second employer had been held liable "for total compensation for loss of the second eye." Lawson, 336 U.S. at 203. The Court noted that

> [a]fter the decision . . . thousands of one-eyed, one-legged, one-armed, one-handed men in the State of Oklahoma [lost their jobs] and [could] not get employment. . . . The decision displaced between seven and eight thousand men in less than 30 days in Oklahoma.

Id. (internal quotation marks omitted). See also Bath Iron Works, 136 F.3d at 41 (quoting Lawson). At the time Lawson was decided, S 8(f) provided

> that if an employee receives an injury which of itself would only cause permanent partial disability but which, combined with a previous disability, does in fact cause permanent disability, the employer shall provide

_____

6. The "Special Fund" under section 8(f) of the Act is often referred to as
the "second injury fund."

compensation only for the disability caused by the subsequent injury: Provided, however, that . . . after the cessation of the payments for the prescribed period of weeks, the employee shall be paid the remainder of the compensation that would be due for permanent total disability. . . . out of the special fund.

Id. at 200. The Court held that this "second injury provision" served a double purpose. "It protects the employer who has hired, say, a one-eyed worker who goes and loses his other eye and becomes a total disability." Id. at 202. However, it "also protects the worker with one eye from being denied employment on account of his being an extra risk. Now, . . . it is possible to protect both the employer and to protect the one-eyed employee also." Id. See also Bath Iron Works Corp., 136 F.3d at 40 (1st Cir. 1998). The Court concluded that the protection of the Act could not have been intended only when the first disability resulted from a covered occupation. If the Act were so limited, the employers would still be reluctant to hire workers with pre-existing injuries. The problem was not the source of the pre-existing injury, but the fact that the worker who came to an employer with a disability posed a greater risk of becoming totally disabled while working for the subsequent employer. The Court in Lawson held that Congress had to intend "previous disability" as used in the Act to include a disability in fact, whether or not it occurred under circumstances covered by the LHWCA. Thus, it was necessary to allow the employer relief from the special fund even though the pre-existing injury was not related to an occupation covered by the LHWCA.

Since Lawson, courts have interpreted the LHWCA in a manner that is consistent with the public policy of preventing discrimination against employees with pre-existing injuries. We have stated that "the underlying congressional purpose in creating the special fund was to encourage the employment of partially disabled persons." Director, Office of Workers' Compensation v. Universal Terminal & Stevedoring Corp., 575 F.2d 452, 456 (3d Cir. 1978).7 Moreover, the congressional committee reports for

_____

7. Several courts of appeals have held that the purpose is only to prevent discrimination. See C.G. Willis, Inc. v. Director, Office of Workers'

11

the 1972 amendments to the LHWCA specifically affirm that section 8(f) relief is intended to "encourage the employment of handicapped workers." H.R. Rep. No. 1411, 92nd Cong., 2nd Sess. 8 (1972).

Congress initially created only two conditions precedent to section 8(f) relief. An employee had to have a preexisting partial disability, and that disability had to combine with a subsequent work injury to create a permanent, total disability. See 33 U.S.C. S 908(f)(1). However, the strong anti-discrimination policy endemic to the LHWCA gave rise to a third condition. That judicially created condition precedent to section 8(f) is known as the "manifestation requirement." This is the condition that is at the center of the instant dispute.

B. The Manifestation Requirement

The "manifestation requirement" arose because of the public policy against discrimination that has been read into the Act since Lawson. Courts have reasoned that an employer can not discriminate if it does not know of a pre-existing injury. Therefore, courts have required that the pre-existing injury be manifest in order to afford the employer relief from the special fund. However, courts were aware that at least two further problems could exasperate rather than ameliorate the problem that the law was trying to remedy. First, proving such knowledge is very difficult. Accordingly, courts credited the employer with knowledge of a preexisting condition which could have been discovered in an employee's medical records even if the employer did not actually know.

_____

Compensation Programs, 31 F.3d 1112, 1115 (11th Cir. 1994); others hold that the purpose is encouraging maritime employers to hire disabled persons. See Newport News Shipbuilding & Dry Dock Co. v. Harris, 934 F.2d 548, 552 (4th Cir. 1991); Todd Pacific Shipyards Corp. v. Director, Office of Workers' Compensation Programs, 913 F.2d 1426, 1429 (9th Cir. 1990). Still others refer to both preventing discrimination and encouraging employers to hire disabled persons. See American Bridge Div., U.S. Steel Corp. v. Director, Office of Workers' Compensation Programs, 679 F.2d 81, 82 n.3 (5th Cir. 1982).

> [s]trong policy considerations dictate that only those
> employers who hire the handicapped with knowledge of
> their disabilities qualify for limited liability. . . . In view
> of the difficulty of proving actual knowledge . . . the test
> is ordinarily an objective one. Conditions that are
> latent rather than manifest to a prospective employer
> do not qualify as S 8(f) disabilities.

Atlantic & Gulf Stevedores, Inc. v. Director, Office of Workers'
Compensation, 542 F.2d 602, 608 (3d Cir. 1976). Allowing
an employer to establish manifestation by way of
constructive knowledge also addressed the concern that the
policy of protecting employees would result in employers
subjecting certain employees to exacting physical
examinations for fear of not learning of a preexisting
condition and becoming ineligible for section 8(f) relief. It is
the availability of knowledge, rather than actual knowledge
of the condition, that is relevant to determining
manifestation. See Universal Terminal & Stevedoring Corp.,
575 F.2d at 456-57; cf. American Mut. Ins. Co. Of Boston v.
Jones, 426 F.2d 1263 (D.C.Cir. 1970). Thus, an employer
who demonstrates that it could readily have discovered the
disability by looking at the employee's medical records is
entitled to S 8(f) relief. Universal Terminal & Stevedoring
Corp., 575 F.2d at 457. See, e.g., Bunge Corp. v. Director,
Office of Workers' Compensation, 951 F.2d 1109, 1111 (9th
Cir. 1991) ("An employer need not have actual knowledge of
an employee's condition. If the condition is readily
discoverable from the employee's medical record in the
possession of the employer, knowledge of the condition is
imputed to the employer."). Against this background, the
vast majority of courts of appeals that have addressed the
issue have agreed that an employee's disability must be
manifest to the employer before the employer can seek relief
from the special fund.8 The manifestation requirement is

_____

8. See C.G. Willis, Inc. v. Director, Office of Workers' Compensation
Programs, 31 F.3d 1112, 1115 (11th Cir. 1994); Sealand Terminals, Inc.
v. Gasparic, 7 F.3d 321, 323-24 (2nd Cir. 1993); Two "R" Drilling Co.,
Inc.
v. Director, Office of Workers' Compensation Programs, 894 F.2d 748, 750
(5th Cir. 1990); Lambert's Point Docks, Inc. v. Harris, 718 F.2d 644, 648
(4th Cir. 1983); Director, Office of Workers' Compensation Programs v.
Cargill, Inc., 709 F.2d 616, 619 (9th Cir. 1983) (en banc); General

13

now widely accepted and was incorporated into the 1984
amendments to the LHWCA through regulations
promulgated under that Act. See 20 C.F.R.S 702.321(a)
(1988).9

Here, the Director denied Sun Ship's S 8(f) application
because "no evidence [was] submitted to show that
[Ehrentraut] had a manifest pre-existing permanent
disability prior to his retirement from work in 1981. . . ."
See Joint Appendix at 52; ALJ Op. at 2. However, Sun Ship
raises an interesting issue of first impression in this circuit.
It argues that the 1984 amendments to the LHWCA
eliminated the manifestation requirement where, as here,
the preexisting injury does not become manifest until after
the employee retires. The ALJ accepted this argument and
reversed the ruling of the Director.

> We are convinced that Section 8(f) should be read
> literally in considering disability from post-retirement
> occupational diseases. Only in this way can Congress'
> intent in passing the 1984 amendments be carried out.
> To establish entitlement to relief from the special fund
> for a post-retirement occupational disease, therefore,
> the employer need only show that there is an existing
> permanent partial disability combined with the same
> and contributed to the resulting permanent total
> disability. In such cases the manifestation requirement
> will not be applied.

ALJ Op. at 3 (internal quotation marks omitted).

_____

Dynamics Corp. v. Sacchetti, 681 F.2d 37, 39–40 (1st Cir. 1982); Director,
Office of Workers' Compensation Programs v. Brandt Airflex Corp., 645
F.2d 1053, 1058 (D.C.Cir. 1981); Universal Terminal & Stevedoring Corp.,
575 F.2d at 456; Duluth, M. & I. R. Ry. Co. v. United States Dep't Of
Labor, 553 F.2d 1144, 1151 (8th Cir. 1977). But see American Ship Bldg.
Co. v. Director, Office of Workers' Compensation Programs, 865 F.2d 727,
731–32 (6th Cir. 1989) (expressly declining to incorporate manifest
requirement for S 8(f) relief).

9. The regulations require that the applicant forS 8(f) limitation of
liability must file an application with the district director containing
"(iii)
the basis for the assertion that the pre-existing condition relied upon
was manifest in the employer. . . ." 20 C.F.R. S 702.321(a)(1).

14

Accordingly, we must determine what effect, if any, those amendments had on the operation of the manifestation requirement.

C. The 1984 amendments

Until 1984, no provision of the LHWCA enabled a maritime worker to collect disability payments for post-retirement occupational diseases. Congress rectified this in 1984 by amending the LHWCA to provide workers with disability coverage for post-retirement long-latency occupational diseases.10 See Longshore and Harbor Workers' Compensation Act Amendments of 1984, Pub. L. No. 98-426, 98 Stat. 1639 (1984). However, nothing in the 1984 amendments suggests a congressional intent to alter the requirements for qualifying for S 8(f) relief. Cf. Bath Iron Works Corp., 126 F.3d at 40. ("We can find nothing in the text of the Amendments, nor its legislative history, to suggest that Congress intended to alter the application of the manifestation requirement to requests for special relief."). Absent statutory language to the contrary, we must conclude that the congressional intent to extend relief did not include relaxing the manifestation requirement to allow employers' relief from the special fund under circumstances that would not previously have entitled them to such relief.

The legislative history of the 1984 amendments clearly indicates a congressional desire to expand employer liability for post-retirement occupational disease, but it does not reflect a desire to allow employers to shift liability for such disability payments to S 8(f) when an employer unwittingly hires an individual whose work-related diseases were asymptomatic, and undocumented. Moreover, relevant portions of the House and Senate Committee reports concerning the 1984 LHWCA amendments suggest a congressional intention to maintain the manifestation requirement. The Senate Report states:

_____

10. Here, Ehrentraut's asbestosis and his malignancy were both sustained while he worked at Sun Ship. However, that does not alter our inquiry under S 8(f). Director, Office of Workers' Compensation Programs v. Sun Shipbuilding & Dry Dock Co., 600 F.2d 440, 443 (3d Cir. 1979).

15

Section 8(f) of the act was designed to encourage employers to hire and retain disabled workers by distributing much of the additional cost of industrial injury attributable to pre-existing permanent disabilities among all employers and carriers subject to the act. An employer able to demonstrate actual, or in some cases, constructive knowledge that an injured worker had a permanent disability which pre-dated a compensable injury is often able to shift to the Special Fund the responsibility for paying a very substantial portion of the amounts payable to the worker. . . . The goals of section 8(f) remain valid.

S. Rep. No. 98-81, at 34 (1983) (emphasis added). This report expressly reaffirms the congressional commitment to the manifestation requirement and also serves to clarify any questions concerning the purpose of S 8(f) relief.

Likewise, the House Committee report states:

Section 8(f) was intended to encourage employers to hire disabled workers and permits such employers to distribute among all employers subject to the Act, much of the cost of compensating such a worker should the worker . . . suffer a subsequent injury.

H.R. Rep. No. 98-570, pt. 1, at 20 (1983), reprinted in 1984 U.S.C.C.A.N. 2734, 2753. While this report does not address the manifestation issue, it states that special fund relief is intended to encourage employers to hire disabled workers. The ALJ based his interpretation of the 1984 amendments upon the reasoning of the Court of Appeals for the Fourth Circuit in Harris. However, we are not persuaded by the analysis in Harris.

D. Newport News Shipbuilding & Dry Dock Co.
    v. Harris

In Harris, the court reasoned that Congress intended to save maritime employers money when it enacted the 1984 amendments. The court looked to the legislative history of the 1984 amendments and concluded that "the amendments as a whole are intended to reduce the cost of Longshore coverage for employers in the covered industries

16

in a manner which will disturb, to the most limited extent possible, the rights and benefits which the Longshore Act provides." Id. at 551. (internal quotation marks omitted). However, the court recognized that this was not Congress' only objective. "Additionally, the amendments relating to post-retirement occupational diseases are meant to insure that long-latency occupational disease claimants do not continue to encounter the severe procedural hurdles which the Longshore Act has presented in the past." Id. (internal quotation marks omitted). The court then reasoned that extending the manifestation requirement to the new category of benefits being conferred would be contrary to Congress' purpose in amending the LHWCA. The court concluded: "[w]hen these goals are considered in concert, it is clear that Congress meant for the 1984 amendments to insure that those suffering from long-latency occupational diseases receive benefits adequate to their needs without greatly increasing the cost of these benefits to the immediate employer by spreading the risk throughout the industry and defraying the increased costs by contributions to the fund." Id. The court added that there "is no suggestion that the relevant . . . amendments are intended . . . to encourage the hiring or continued employment of the handicapped." Id. Thus, the court held that the 1984 enactment did not extend the manifestation requirement to the new category of post retirement disability coverage afforded under those amendments.

The ALJ concluded that, under Harris, the manifestation requirement for pre-existing disabilities does not apply when total disability comes about as a result of a long-latency period post-retirement occupational disease. We disagree. First, we doubt that the employers' increased exposure was driven by, or intended to be circumscribed by, a countervailing policy of saving employers' money. Neither the text of the amendments, their legislative history, nor the substantial body of appellate decisions interpreting the Act suggest that we should ameliorate the greater exposure inherent in the amendments by reading the manifestation requirement out of the Act. Second, we do not understand how Congress could have sought to "disturb, to the most limited extent possible, the rights and benefits which the Longshore Act provides" as the Harris

17

court stated, while eliminating the manifestation requirement that has been a prerequisite to relief from the special fund almost since its creation more than 70 years ago.

Had Congress wanted to expand liability only on the condition that the almost universally accepted manifestation requirement be eliminated, it could certainly have said so. A departure from the longstanding requirement of manifestation should emanate from the statute's text, not its ethers. Sun Ship was not aware of any risk from a pre-existing injury or condition when it hired Ehrentraut, and we fail to see why it should now be entitled to relief under section 8(f). We conclude that the more cogent analysis, and the better reasoned approach, is that set forth by the Court of Appeals for the First Circuit in Bath Iron Works Corp. We will not assume that Congress intended to effect a change in such a longstanding provision of the law by relying upon inference and jurisprudential deductions. Accordingly, we find the ALJ's reliance upon Harris misplaced.

V. CONCLUSION

For the reasons set forth above, we conclude that Sun Ship is not entitled to shift liability to the Special Fund under S 8(f), and the decision of the ALJ will be reversed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

18